**Robert C. GUCCIONE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 85 Civ. 3333 (CBM).

United States District Court, S.D. New York.

Sept. 10, 1987.

Norman Roy Grutman, Jewel Bjork, Thomas Marino, Grutman Miller Greenspoon & Hendler, Robert Gold, Elliot Silverman, Richard Ben-Veniste, Peter Isakoff, Gold & Wachtel, New York City, Ben-Veniste & Shernoff, Washington, D.C., for plaintiff.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. (David R. Lewis, Asst. U.S. Atty. of counsel), New York City, for defendant.

## OPINION

MOTLEY, District Judge.

Plaintiff Robert C. Guccione has brought this lawsuit under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), for injuries he allegedly sustained during the course of the FBI's highly publicized ABSCAM investigation of government corruption in the late 1970's. Guccione is a well known magazine publisher and entertainment entrepreneur. He claims that his attempts to obtain financing for a contemplated Atlantic City, New Jersey casino were obstructed by the malicious and intentionally tortious conduct of an ill supervised FBI operative, Melvin Weinberg, thus causing Guccione injury in excess of four million dollars.

The Government has now moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) on the grounds that this court is without jurisdiction over plaintiff's claim because of sovereign immunity. The Government has moved in the alternative for summary judgment on the ground that this action is barred by the statute of limitations.

Because, for the reasons that follow, this court finds that plaintiff's claim is barred both on sovereign immunity and statute of limitations grounds, the Government's motions are granted and this case is dismissed.

*Sovereign Immunity*

a. *Background*

Plaintiff alleges in his complaint that he was injured by the FBI's negligent supervision and control of Melvin Weinberg, a key operative in the FBI's ABSCAM investigation in the late 1970's. Specifically, plaintiff alleges that "in carrying out ABSCAM, the FBI employed or otherwise engaged Melvin Weinberg," an individual with a known history of illegal fraudulent activity, "to assist in the investigation as an informant and operative, and [that] Weinberg rendered his services ... while under the control of the FBI and its special agents." (Complaint, ¶¶ 5, 6, 7). According to plaintiff, Weinberg posed as the agent of a

fictitious Arab investment company called Abdul Enterprises at the direction and under the supervision of the FBI. (Complaint ¶ 8).

During the period of time that ABSCAM was being carried out, plaintiff was attempting to obtain financing for an Atlantic City casino project. In connection with this project, Guccione's application for a casino license was pending before various state and local New Jersey authorities. (Complaint ¶ 9, 10). Plaintiff alleges that Melvin Weinberg, acting "with the full knowledge, acquiescence, support, cooperation, assistance and/or direction of his supervising FBI agents," "undertook to persuade plaintiff to commit illegal acts," including the bribery of a state casino licensing official. (Complaint ¶ 11). When Guccione, according to his complaint, refused to participate in the illegal activities, "Weinberg engaged in a series of intentional, wrongful acts including ... defaming plaintiff, interfering with plaintiff's business venture, and making false and unfounded representations concerning plaintiff's integrity and character to prospective lenders...." (Complaint ¶ 13). As a result of Weinberg's defamatory misrepresentations, plaintiff was allegedly unable to obtain financing to complete the casino project.

The gravamen of plaintiff's claim against the United States is that the "FBI had a duty to control the conduct of Weinberg so as to prevent him from causing injury to Guccione...." (Complaint ¶ 17). Plaintiff claims that the "FBI breached that duty by failing to use requisite care in selecting, training, instructing, supervising and controlling Weinberg in his role as agent for 'Abdul Enterprises,'" and that plaintiff was injured as a proximate result of this negligence.

**b.** *Discussion*

The United States is immune from suit absent an express waiver of its sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Absent such a waiver, the federal courts are without subject matter jurisdiction to entertain a suit against the United States. *Lambertson v. United States*, 528 F.2d 441, 443 (2d Cir.), *cert. denied*, 426 U.S. 921, 96 S.Ct. 2627, 49 L.Ed.2d 374 (1976).

The Federal Tort Claims Act waives the government's sovereign immunity for certain claims caused by the "negligent or wrongful act or omission" of a government employee. 28 U.S.C. § 1346(b). The FTCA is only a limited waiver of immunity, however, and Section 2680 of the Act sets forth several categories of tort claims for which the United States has not waived its immunity. One of these, the "intentional torts exception" to the FTCA's waiver of immunity, 28 U.S.C. § 2680(h), clearly bars plaintiff's claims in this suit.

Section 2680(h) provides that the United States' waiver of sovereign immunity under the FTCA shall not apply to "[a]ny claim *arising out of* assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."[1] (emphasis added). The Second Circuit has interpreted the clear language of the statute as barring all claims "arising out of" the enumerated intentional torts, regardless of whether the claims are pleaded forthrightly in terms of the intentional tort itself, or indirectly, as claims for negligent supervision of the intentional tortfeasor, or negligent failure to protect the victim from the intentional tortfeasor's harmful propensities. *Miele v. United States*, 800 F.2d 50 (2d Cir.1986); *Johnson v. United States*, 788 F.2d 845 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107

---

**1.** The 1974 amendment to the intentional tort exception of the FTCA, 28 U.S.C. § 2680(h), narrows the exception so as to permit claims against federal law enforcement officers "arising out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." This liberalization of the government's waiver of sovereign immunity is inapplicable in the present case, however, because the intentional torts complained of by plaintiff are in the nature of libel, slander, misrepresentation, deceit, and interference with contract rights, categories for which the United States has preserved its immunity.

S.Ct. 315, 93 L.Ed.2d 288 (1986). *See also United States v. Shearer*, 473 U.S. 52, 55, 105 S.Ct. 3039, 3042, 87 L.Ed.2d 38 (1985) (plurality opinion); *Thigpen v. United States*, 800 F.2d 393 (4th Cir.1986); *Satterfield v. United States*, 788 F.2d 395, 399–400 (6th Cir.1986); *Garcia v. United States*, 776 F.2d 116, 117–18 (5th Cir.1985); *Wine v. United States*, 705 F.2d 366 (10th Cir.1983); *Naisbitt v. United States*, 611 F.2d 1350 (10th Cir.), *cert. denied*, 449 U.S. 885, 101 S.Ct. 240, 66 L.Ed.2d 111 (1980).

As stated by the court in *Miele,*

> The intentional tort exception to the Act bars not only claims for assault and battery, but also any claim *arising out of* the assault and battery. "[I]t is inescapable that the phrase 'arising out of assault [or] battery' is broad enough to encompass claims sounding in negligence." (citing *United States v. Shearer*, 105 S.Ct. at 3043).
>
> Allowing claims against the government that are stated in negligence, but actually arise from an assault and battery would defeat Congress' purpose to bar suits against the government for injuries caused by a government employee's commission of assault and battery. (citing *Johnson v. United States*, 788 F.2d 845, 850 (2d Cir.1986)).

*Miele v. United States*, 800 F.2d at 52 (2d Cir.1986) (emphasis in original).

The Second Circuit's reasoning in *Johnson* was equally broad and explicit:

> It is ... clear that the claim here is for injuries *caused by* the employee's assault and battery and that, absent the assault and battery, no claim could exist.... To permit such a claim to be stated in terms of a negligence theory ... would defeat Congress' purpose in enacting § 2680(h). The claim, although stated in terms of negligence, would still be for injuries caused by and arising out of the assault and battery.

*Johnson v. United States*, 788 F.2d at 850–51 (2d Cir.1986) (emphasis in original) (citations omitted).

In the present case, plaintiff alleges that he suffered injuries in excess of four million dollars caused by the defamatory misrepresentations and other wrongful acts of FBI operative Melvin Weinberg. Plaintiff also alleges the actual participation of FBI agents in Weinberg's various intentional torts by virtue of their "cooperation, assistance and/or direction" in Weinberger's activities. (Complaint ¶ 11). In the face of the FTCA's unambiguous refusal under 28 U.S.C. § 2680(h) to recognize claims for intentional torts, however, plaintiff's theory of government liability is that the FBI was negligent in its selection, training, and supervision of Weinberg. (Complaint ¶ 18).

■ There can be no question, from the clear language of plaintiff's complaint, that Guccione's claims arise out of the alleged intentional torts of both Weinberg and the FBI's own agents. Thus, regardless of whether they are pleaded as claims grounded in the intentional torts themselves, or as claims against the FBI for its alleged negligent supervision and control of Weinberg, Guccione's claims are barred by the intentional torts exception to the FTCA, § 2680(h), and by the Second Circuit's broad and logical interpretation of this section in *Miele* and *Johnson*.

Plaintiff has argued that his claims are not barred by § 2680(h) or by the holdings in *Johnson* and *Miele* because Weinberg was not an official government employee at the time he committed the intentional torts of which plaintiff here complains. Plaintiff contends that although under current Second Circuit law the United States could not be liable for the negligent supervision of Weinberg had he been a formal government employee, because Weinberg was a mere "informant" or "operative" of the FBI, *see* Complaint ¶ 5, the government may indeed be liable for injuries arising out of Weinberg's intentional torts by virtue of FBI negligence in supervising and controlling him. Guccione relies primarily on the case of *Panella v. United States*, 216 F.2d 622 (2d Cir.1954) for this proposition.

In *Panella v. United States*, 216 F.2d 622 (2d Cir.1954), the Second Circuit held that the intentional tort exception to the FTCA did not bar claims arising out of the intentional torts of third parties in the government's custody or control where the

injury was attributable to a federal employee's negligent supervision of the tortfeasor. *Panella* involved an assault by one prisoner on another prisoner in a hospital prison, allegedly caused by the government's failure to provide adequate guards and otherwise properly supervise those confined in the institution. *Id.* at 623. *Panella* has been narrowly applied to permit a negligent supervision claim, despite the strictures of § 2680(h), in a limited number of cases where the tortfeasor's conduct was in no way at government behest and where the essence of the tortfeasors' relationship with the government was precisely to be supervised. *See Muniz v. United States,* 305 F.2d 285 (2d Cir.1962), *aff'd,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (assault by federal prison inmates on another inmate); *Gibson v. United States,* 457 F.2d 1391 (3rd Cir.1972) (attack on counsellor by mentally imbalanced drug addict enrolled in program at federal camp); *Fleishour v. United States,* 244 F.Supp. 762, 766 (N.D.Ill.1965), *aff'd.* 365 F.2d 126 (7th Cir.), *cert. denied* 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966) (assault by federal prisoner on another prisoner).

■ Plaintiff's suggestion that *Panella* should be applied to allow his claim for negligent supervision in this action on the grounds that Weinberg was a third party rather than a government employee is utterly without merit. Even if Weinberg's status as a federal employee within the meaning of the FTCA remains unclear,[2] according to plaintiff's own complaint Weinberg was no mere third party. Instead, Weinberg's ABSCAM activities are alleged to have been at the behest of the FBI and in furtherance of the FBI's own goals, for better or for worse. Furthermore, the context of Weinberg's ABSCAM operations, a context in which the essence of Weinberg's relationship with the FBI was to perform services, is in stark contrast to the situation dealt with in cases such as *Panella* where supervision or care of the intentional tortfeasor is the whole reason for any relationship between the

tortfeasor and the government in the first place. Thus, because the facts and the rationale of *Panella* are so entirely distinct from Guccione's situation, this case provides no support for plaintiff's attempt to bypass the intentional tort exception to the FTCA by pleading negligent supervision.

Guccione also appears to make a more general argument that his claim should not be barred by the intentional tort exception of the FTCA and by the *Johnson* and *Miele* holdings disallowing intentional tort claims in the guise of negligent supervision claims. Even without reference to *Panella,* argues plaintiff, simply because Weinberg was not formally a government employee *Johnson* and *Miele* do not bar Guccione's FTCA suit for negligent supervision of the intentional tortfeasor. This argument is unconvincing, not only because the formal employee status of the tortfeasor is irrelevant under the broad "arising out of" holdings of *Johnson* and *Miele,* but also because it ignores relevant case law directly to the contrary, disregards explicit provisions of the FTCA itself, and leads to absurd results.

■ To begin with, the FTCA's definition of "employee" for purposes of the Act does not require that a person possess formal employee status. Rather, it includes any "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. *See Witt v. United States,* 462 F.2d 1261, 1263–64 (2d Cir. 1972); *see also Logue v. United States,* 412 U.S. 521, 526–28, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121 (1973). Weinberg is alleged by plaintiff to have been "employed or otherwise engaged" by the FBI "to assist in the [ABSCAM] investigation" and to have "rendered his services, including all acts complained of [in the complaint]" while so engaged. Although the ultimate determination of Weinberger's federal employee status is a factual one which is not properly addressed in this motion for judgment on

**2.** See infra, pp. 531–32.

the pleadings,[3] by the plain language of plaintiff's complaint, Weinberg's relationship with the FBI during his ABSCAM activities was either that of an employee within the meaning of the Act, or at least that of an independent contractor. *See Logue v. United States*, 412 U.S. 521, 527–28 & n. 5, 93 S.Ct. 2215, 2219 & n. 5, 37 L.Ed.2d 121 (1973) (an independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking).

■ If Weinberg were ultimately found to have been an employee for FTCA purposes under the broad definition set forth in the statute, *see Socialist Workers Party v. Attorney General of the United States*, 642 F.Supp. 1357, 1423 (S.D.N.Y.1986) (FBI informants held to be employees for purposes of FTCA), then plaintiff's contention in this motion that he is entitled, notwithstanding *Miele* and *Johnson*, to make a negligent supervision claim because Weinberg was not officially a government employee would fall fatally flat. If, on the other hand, Weinberg were found to have been an independent contractor, *see Slagle v. United States*, 612 F.2d 1157, 1159–61, 1163 (9th Cir.1980) (informant may be an independent contractor within the meaning of the FTCA), then case law and common sense make it apparent that plaintiff could not make out a cause of action against the government for the intentionally tortious defamatory acts of this individual who, as an independent contractor, was beyond the FBI's right of control. *See United States v. Orleans*, 425 U.S. 807, 814–15, 96 S.Ct.

1971, 1976, 48 L.Ed.2d 390 (1976); *Logue v. United States*, 412 U.S. 521, 525–27, 93 S.Ct. 2215, 2218–19, 37 L.Ed.2d 121 (1973). It defies logic that the United States could be held liable, via a theory of negligent supervision, for the intentional torts of non-employee, independent contractor FBI operatives, even while it could not be held liable for negligent supervision of its own employees who committed intentional torts.

Finally, regardless of the label that is applied to Weinberg's employment relationship with the FBI, all circuits that have considered the matter have held that the intentional tort exception of the FTCA covers intentional torts by informants or undercover operatives and that this limitation cannot be circumvented by allegations that these individuals were negligently supervised or controlled. *Boda v. United States*, 698 F.2d 1174 (11th Cir.1983); *Leaf v. United States*, 661 F.2d 740 (9th Cir. 1981), *cert. denied* 456 U.S. 960, 102 S.Ct. 2036, 72 L.Ed.2d 484 (1982); *Redmond v. United States*, 518 F.2d 811 (7th Cir.1975). Furthermore, although the Second Circuit has never directly ruled on the applicability of the intentional torts exception to undercover informants or operatives, in *Johnson v. United States*, where the court unambiguously announced its broad interpretation of the "arising out of" language of the § 2680(h), it also explicitly rejected the reasoning of the major case relied on by plaintiff herein for the proposition that intentional torts by undercover operatives may be actionable on a theory of negligent supervision, *Liuzzo v. United States*, 508 F.Supp. 923 (E.D.Mich.1981). *Johnson v. United States*, 788 F.2d at 853 n. 8 (2d Cir.1986).[4]

---

**3.** The liberal reading in a plaintiff's favor necessarily accorded to a complaint on a motion to dismiss for failure to state a claim under Fed.R. Civ.P. 12(b)(6) is less applicable in a motion to dismiss based on lack of subject matter jurisdiction. Indeed, in the context of a complaint brought under the FTCA, plaintiff is required to allege sufficient independent facts to withstand any potential bars to the court's subject matter jurisdiction. The court must "look beneath the language of the complaint to determine the substance of the claim." *Johnson v. United States*, 788 F.2d 845, 854 (2d Cir.1986) (citations omitted).

**4.** *Liuzzo v. United States*, 508 F.Supp. 923 (E.D. Mich.1981) and the related district court case of *Bergman v. United States*, 565 F.Supp. 1353 (W.D.Mich.1983), in allowing claims based on the government's alleged negligent supervision and negligent failure to warn with respect to certain violent undercover operatives, both clearly rejected the reasoning later set forth by the Second Circuit in *Johnson* and *Miele* in disallowing such claims. Both *Luizzo* and *Bergman* concluded that the intentional tort exception to immunity created by § 2680(h) should not be applied "[w]hen injuries directly resulting from assaults and batteries may be reason-

In conclusion, and notwithstanding plaintiff's strained argument that he has stated a cognizable claim against the government for its negligent supervision and control of Melvin Weinberg, Guccione's claim for injuries allegedly sustained with respect to his Atlantic City casino project unquestionably arose out of the alleged intentional torts of a government operative, and thus falls within the FTCA's intentional tort exception to the United States' waiver of sovereign immunity. Accordingly, this court having no subject matter jurisdiction over plaintiff's claim, it is dismissed in its entirety.

*Statute of Limitations*

■ Plaintiff's failure to file the present lawsuit within the applicable statute of limitations provides an adequate and independent basis for dismissal of this action. Based on factual material in the form of news clippings and letters from plaintiff's own files, and other public information that was widely and prominently reported in the New York and national press, it is beyond dispute that plaintiff knew or should have known the critical facts of his claim by at least March 1982, if not well before that. Thus, plaintiff's initiation of this action on November 28, 1984 was unquestionably untimely under the applicable two year statute of limitations.

a. *Facts*

It is undisputed that plaintiff's dealings with Melvin Weinberg as a representative of "Abdul Enterprises," from which the injuries complained of herein are said to have arisen, occurred in late 1978 and early 1979. Plaintiff met or spoke with Weinberg during this time on at least three separate occasions to discuss prospective financing for Guccione's casino project. Weinberg, who used his own name, also suggested on these occasions the possibility of securing a casino license through corrupt means. According to plaintiff's complaint, the FBI's negligent supervision and control of Weinberg made it possible for Weinberg surreptitiously to defame Guccione to potential lenders and otherwise interfere with his business projects. According to plaintiff's complaint, Weinberg's defamatory tactics caused crucial lenders to shy away, resulting in vast financial injury to plaintiff.

The FBI's ABSCAM investigation resulted in several highly publicized indictments and trials of prominent individuals in 1980 and 1981. When the FBI's undercover tactics during the course of the ABSCAM investigation, and particularly its use of Melvin Weinberg as an operative, were revealed, they became the object of extensive debate and criticism in the media. The controversy regarding the FBI's conduct of ABSCAM resulted in an investigation by the United States Senate, which in turn resulted in the publication of a report by a select committee of the Senate in January 1983.[5]

Plaintiff initiated the present action on November 28, 1984 by presenting an administrative claim to the FBI.[6] Thus, in

---

ably alleged to have their roots in negligence." *Bergman*, 565 F.Supp. at 1411 (citing *Liuzzo* at 928–29).

Moreover, without deciding whether the informant tortfeasors were or were not employees within the meaning of the FTCA, in holding that the government could be liable by reason of its alleged negligent supervision, *Liuzzo* explicitly and emphatically rejected the significance of the intentional tortfeasor's employment status. 508 F.Supp. at 930. Thus, Guccione's attempt to circumvent *Miele* and *Johnson* by relying on the employment status of Weinberg is at odds with the principal case relied on by plaintiff himself. In fact, *Liuzzo* achieves the result advocated by plaintiff in this motion—permitting a claim for the government's negligent supervision of an intentional tortfeasor—only by its wholehearted

rejection of the broad "arising out of" interpretation of § 2680(h) which controls in this Circuit.

5. *Final Report of the Select Committee to Study Undercover Activities of Components of the Department of Justice to the United States Senate,* S.Rep. No. 682, 97th Cong., 2d Sess. (1982) (ordered to be printed December 15 (legislative day, November 30), 1982)).

6. Plaintiff filed an initial administrative claim several months earlier on July 18, 1984 which was rejected by the agency because it did not contain a "sum certain" of alleged damages. It is well established that the statement of a "sum certain" in the administrative complaint is a jurisdictional prerequisite to any claim under the Federal Tort Claims Act. *See, e.g., Allen v.*

order for his claim to have been timely under the FTCA's two year statute of limitations, it must have accrued no earlier than November 1982.

Plaintiff contends that his claim did not accrue until January 1983 when the publication of the Senate Report on ABSCAM alerted him for the first time to the critical facts of the injury he had suffered in the late 1970's as a result of the FBI's undercover operation. In determining when plaintiff knew or should have known, however, the critical facts of his alleged injury,[7] the court must also consider the following indisputable facts as to information about ABSCAM that was publically available, and indeed known to plaintiff, far earlier than the publication of the Senate's Report.

The extensive press coverage arising out of the ABSCAM indictments and trials made the existence of this notorious FBI investigation a matter of public knowledge by 1980. ABSCAM's focus on the Atlantic City gambling industry, and its use of Melvin Weinberg as a representative of "Abdul Enterprises" were prominently reported. Defendant's Exhibits J, K, L, M, N, O, P, Q. (More than 20 news articles published during 1980 in various newspapers and magazines, including all four major New York City dailies; Exhibits N, O, and P, regarding the trial and conviction of one of the ABSCAM defendants are from plaintiff's own files of news clippings.)

By 1981 it is clear that plaintiff also knew he was a potential target of the ABSCAM investigation. There was extensive press coverage of the fact that the FBI had been interested in Guccione's potentially illegal Atlantic City activities during the ABSCAM investigation. Defendant's Ex-

hibits O, P (several news articles dating from 1980 and 1981, including one in the *New York Times,* discussing a recently unsealed 1979 affidavit of a government prosecutor linking Guccione with ABSCAM targets). *See also, e.g.,* Defendant's Exhibits R, U, CC (1981 press coverage implicating Guccione and his business ventures in the ABSCAM scandal). Several of these articles were discovered during the course of the present litigation in plaintiff's own files of news clippings.

There was also press coverage, during and even prior to 1981, of the reactions of plaintiff and his lawyer, Norman Roy Grutman, to these reports implicating Guccione in the 1979 ABSCAM investigation. An Associated Press Story dated September 6, 1980 quotes Grutman as saying that the allegations were "utterly shocking." Defendant's Exhibit O at p. 3. Another Associated Press syndicated story dated January 19, 1981 reported the reactions of Guccione, himself, as follows:

> Penthouse magazine publisher Robert Guccione says a key Abscam operative offered to arrange a multimillion-dollar loan for Guccione's Atlantic City casino project if the publisher bribed the chairman of the New Jersey Casino Control Commission.

> "They wanted to create corruption," Guccione said in a weekend interview with The Associated Press. "It didn't make sense to me what they were up to, but now it's all clear."

This January 19, 1981 story, Defendant's Exhibit R, pp. 3–4, a copy of which was discovered in plaintiff's clippings files, continued by reporting Guccione's version of his contacts with Melvin Weinberg in 1979.

---

*United States,* 517 F.2d 1328 (6th Cir.1975); *Cooper v. United States,* 498 F.Supp. 116, 118 (W.D. N.Y.1980); *Miller v. United States,* 418 F.Supp. 373 (D.Minn.1976); *College v. United States,* 411 F.Supp. 738 (D.Md.1976), *aff'd.* 572 F.2d 453 (4th Cir.1978); *Fallon v. United States,* 405 F.Supp. 1320 (D.Mont.1976). *See also Lotrionte v. United States,* 560 F.Supp. 41 (S.D.N.Y.1983), *aff'd.* 742 F.2d 1436 (2d Cir.1983). Thus, there appears to have been nothing improper or out of the ordinary about the agency's rejection of plaintiff's initial complaint. In any event, as

discussed below, even if the July 1984 filing had been accepted, it would still not have been within the two year limitations period which began running clearly no later than March 1982.

**7.** As discussed *infra,* pp. 535–36, the date on which Guccione either knew or reasonably should have known the critical facts of his alleged injury provides the most liberal accrual date potentially available to him on the claims asserted herein.

Another critical element of plaintiff's claim against the government in this lawsuit is the specific injury allegedly suffered, i.e., that the FBI's conduct of ABSCAM had the effect of obstructing Guccione's ability to obtain crucial financing for his casino project. Press coverage, including statements from Guccione, and material from plaintiff's own files indicate his actual awareness that his implication in ABSCAM had had such an effect. *See* Defendant's Exhibit V (*Wall Street Journal* article dated Feb. 15, 1980 assessing the effect of ABSCAM and quoting Guccione on the investigation's adverse effect on financing availability). *See also* Defendant's Exhibits W, X (February and September 1980 letters from financial institutions regarding the damage to plaintiff's financing efforts caused by ABSCAM.) A September 27, 1980 letter concerning the casino's financing problems, Defendant's Exhibit X, which clearly came to Guccione's direct attention,[8] is particularly noteworthy for the following statement: "There are also *grave rumors* of huge debts incurred by you ... and of course Abscam and organized crime connections." Defendant's Exhibit X.

A final category of information crucial to the FTCA claim that plaintiff has made in this lawsuit[9] is information regarding the FBI's manner of supervising and controlling Melvin Weinberg, the undercover operative who allegedly stymied Guccione's casino financing efforts. It is beyond dispute that well before March 1982, Guccione was fully aware that the FBI's handling of Weinberg was extraordinarily flawed. An article in plaintiff's own publication, *Penthouse Magazine*, regarding the FBI's conduct of ABSCAM states in pertinent part:

Weinberg became an unguided missile for the FBI. In flagrant violation of the bureau's own rules for the handling of informants—rules that require FBI agents to keep a constant, careful record of what its informants do and say as they pursue their prey—Weinberg filed no reports, and the agents responsible for him kept few if any written records. Accordingly, fast-buck Mel was free to use unconstitutional means to bag his game.

Defendant's Exhibit Y at p. 1 (September 1981 *Penthouse Magazine* article by Nat Hentoff). Other articles and columns, including a series of nationally syndicated columns by Jack Anderson, expressing similar outrage over the FBI's unaccountable relationship with Weinberg and its overall lax handling of the investigation appeared prominently in the national press. *See* Defendant's Exhibits Z, AA (including *New York Times, Christian Science Monitor,* and *Newsday,* etc., articles from between May 1981 and March 1982). A May 1981 *Newsday* story reporting that "[s]ome members of Congress ... have accused the FBI of inadequate control over informants and middlemen in the probe," Defendant's Exhibit AA, and a March 1982 *Christian Science Monitor* piece recounting Senator Alan Cranston's charges "that the chief undercover operator, convicted con-man Mel Weinberg, 'was totally out of control' in Abscam," Defendant's Exhibit AA, are typical.

b. *Discussion*

Title 28 U.S.C. § 2401(b) provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues...." The general rule for accrual of an FTCA claim is that accrual occurs at the time that the injury or harm is inflicted. *See Barrett v. United States,* 689 F.2d 324, 327 (2d Cir.1982), *cert. denied* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). Applying this most commonly applicable FTCA accrual rule, the accrual of Guccione's claim would have been in 1979 when he was allegedly injured by Wein-

---

8. Attached to this letter discovered in plaintiff's files was a cover memo addressed to a Guccione aide that stated, "Mr. Guccione asked that I send a copy of the attached correspondence to you."

9. The court has already ruled, of course, earlier in this opinion, that plaintiff's claim against the FBI for negligence in its supervision of Weinberg is barred by sovereign immunity and must be dismissed in any event.

berg's defamatory activities and the FBI's negligent supervision of this individual. There would be no question were this accrual standard to be applied that Guccione's 1984 filing was untimely.

In exceptional FTCA cases, however, for example in medical malpractice actions where plaintiff's injury may be "unknown" or "inherently unknowable" at the time it occurs, the application of a diligence-discovery rule of accrual may be applied. *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); *Barrett v. United States*, 689 F.2d at 327. This special rule of accrual may also be applied where it has been shown that the plaintiff was blamelessly ignorant of his claim due to the government's deliberate concealment of its facts. *Barrett v. United States*, 689 F.2d at 327.

The diligence-discovery rule of accrual provides that accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the "critical facts" of his claim. *Barrett v. United States*, 689 F.2d at 327. Possession of the "critical facts" of a claim means knowledge of, or knowledge that could lead to, the basic facts of the injury, i.e., knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it. *See United States v. Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359; *Barrett v. United States*, 689 F.2d at 328. In order for a claim to accrue under the diligence-discovery rule, a plaintiff need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim. *United States v. Kubrick*, 444 U.S. 111, 122, 100 S.Ct. 352, 359, 62 L.Ed.2d 259. Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice. *Kubrick* at 122–25, 100 S.Ct. at 359–61; *Lee v. United States*, 485 F.Supp. 883, 886 (E.D.N.Y.1980). Whether a plaintiff "should have known" these critical facts, even if he did not actually know them, is decided by reference to whether a reasonable person exercising due and reasonable diligence would have discovered

such facts. *See Barrett v. United States*, 689 F.2d at 330.

■ Whether the exceptional diligence-discovery rule of accrual for an FTCA claim is triggered is a factual question. In the present case, in order for this rule to apply, plaintiff has the burden of proving that there was some deliberate attempt by the government to conceal the critical facts of his claim. Although in his complaint plaintiff has not even pleaded such an allegation, he has argued it on this motion. While given the context of the alleged injury here the FBI's interest in concealment does not seem at all unlikely, this ultimate determination cannot be made on this motion. The disputed issue of material fact as to whether there was active FBI concealment, however, does not preclude a grant of summary judgment in this action. Assuming, *arguendo*, that the more generous discovery rule of accrual had in fact been triggered by the government's active concealment, it is still beyond dispute that plaintiff knew or should have known by at least March 1982 the critical facts of the claim here asserted.

Extensive press coverage of the ABSCAM trials and the ABSCAM controversy in general, dating from 1980 to early 1982, much of which was contained in plaintiff's own news clipping collection, revealed the critical facts that Guccione had been of interest to the FBI in connection with the investigation and that Melvin Weinberg had been one of its key operatives. The outrageousness of Weinberg's techniques and the shocking laxness of the FBI's supervision of this individual had both been extensively criticized in the press. Guccione knew that rumors about him arising out of ABSCAM had seriously hampered his ability to obtain casino financing. By well before March 1982 Guccione knew that his dealings with Weinberg in late 1978 and 1979 had not been any ordinary business contacts but were wholly a product of FBI scheming. These facts were more than enough to alert him to the claim he sets forth in the present lawsuit.

■ Guccione argues that his claim did not accrue until the publication of the Sen-

ate Report in January 1983 because he did not know and could not have discovered certain specific details of his present allegations regarding Weinberg's intentionally tortious activities in 1979 and the FBI's failure to oversee Weinberg properly. The court rejects this argument. The diligence discovery rule does not preclude a claim from accruing until a plaintiff has actual access to every detail of his alleged injury and to information alerting him to every possible legal theory of recovery to which his injury might give rise. Because the information regarding Guccione in the Senate Report is largely duplicative, though it provides greater detail, of information that had already been a matter of public knowledge by early 1982, the Senate Report's publication cannot supply plaintiff with his desired later accrual date.

To the extent that Guccione contends that prior to the publication of the Senate Report he did not have sufficient information to make the specific allegations he has asserted in this action, i.e., that in the late 1970's Weinberg defamed him to prospective lenders, it is extremely noteworthy that the Senate Report makes no reference to any such prospective lenders. Indeed, plaintiff's counsel has stipulated to this fact. Defendant's Exhibit E, pp. 89–92. Thus, even if plaintiff could point to any factual basis for this detail of his allegations, and even if this detail were critical to plaintiff's cause of action herein, Guccione could not rely on the Senate Report to provide a late accrual date for his tort claim against the United States. In any event, the inferences and legal theories at the basis of the present lawsuit that Guccione argues became possible only with the appearance of the Senate Report—specifically those allegations regarding Weinberg's defamatory remarks to lenders—are clearly inferences that any reasonable person could have made from the ample public information available to and known by plaintiff well before March 1982.

■ The question whether an FTCA plaintiff knew or should have known the critical facts of his claim, and the subsidiary question of whether he exercised due diligence to discover them are ordinarily matters for the finder of fact to determine at trial. *See Barrett v. United States,* 689 F.2d at 330. However, where, as in the present case, it is beyond dispute that plaintiff should have known and, indeed, actually knew the critical facts of his claim, summary judgment is appropriate.

The outrage expressed in the 1983 Senate Select Committee Report at the FBI's handling of the ABSCAM investigation, and particularly its distress with Melvin Weinberg's conduct during ABSCAM and with the targeting of individuals such as Guccione, might help to make plaintiff's claims against the government in this action sympathetic ones were they legally cognizable. However, it is beyond dispute that even applying the most liberal judicial interpretation of the Congressionally mandated two year statute of limitations for FTCA claims, plaintiff's lawsuit is untimely. Plaintiff cannot rely on Congressional censure of FBI activities in ABSCAM to excuse his own clear procedural default as to any ABSCAM related claims against the government that he once, conceivably, may have had.

*Conclusion*

In accordance with the foregoing, defendant's motion for judgment on the pleadings on the grounds of sovereign immunity is granted. Defendant's alternate motion for summary judgment is also granted, the court having found that even under the most liberal statute of limitations rule potentially available to plaintiff on his FTCA claim, this claim has not been timely made. Accordingly, this action is dismissed in its entirety.