**Maria GRANCIO, individually, and in her capacity as Executrix and Personal Representative of the Estate of Nicholas P. Grancio, Plaintiff,**

v.

**R. Lindley DE VECCHIO; Christopher Favo; United States of America, Defendants.**

No. 06–CV–0069 (FB).

United States District Court, E.D. New York.

March 27, 2009.

---

9. To the extent that the court requires English translations, the court will advise counsel as the need arises.

David I. Schoen, Esq., Montgomery, AL, for Plaintiff.

Benton J. Campbell, Esq., United States Attorney, Eastern District of New York by Gail A. Matthews, Esq., Assistant United States Attorney, Brooklyn, NY, for Defendant United States.

Sunny H. Kim, Esq., Thompson Hine, New York, NY, for Defendant R. Lindley DeVecchio.

Michael G. Considine, Esq., Day Pitney, LLP, Stamford, CT, for Defendant Christopher Favo.

*MEMORANDUM AND ORDER*

BLOCK, Senior District Judge.

On July 24, 2008, the Court entered a Memorandum and Order ("the July 24th M & O") dismissing the claims brought by Maria Grancio ("Mrs.Grancio"), on behalf of herself and the estate of her late husband, against R. Lindley DeVecchio, Christopher Favo and the United States. *See Grancio v. DeVecchio*, 572 F.Supp.2d 299 (E.D.N.Y.2008). The Court held that Mrs. Grancio had "failed to adduce sufficient admissible evidence to support her claim that DeVecchio and Favo played a part in her husband's murder." *Id.* at 314. Familiarity with the July 24th M & O is presumed.

Mrs. Grancio now moves for reconsideration pursuant to Federal Rule of Civil Procedure 59(e) and Local Rule 6.3. In addition, she seeks relief from judgment pursuant to Federal Rule of Civil Procedure 60(b). For the following reasons, the motions are denied.

## I. Motion for Reconsideration

■ The standards for reconsideration under Rule 59(e) and Local Rule 6.3 are the same: "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d-255, 257 (2d Cir.1995). Mrs. Grancio contends that the Court overlooked two such matters.

### A. Grounds for Summary Judgment

■ Mrs. Grancio first argues that the government's motion for summary judgment was addressed solely to the issues of exhaustion and the statute of limitations and, therefore, that the Court's statement that "[a]ll defendants seek, in the alternative, summary judgment on the merits," *Grancio,* 572 F.Supp.2d at 302, was incorrect. She argues that dismissal of her FTCA claims without notice that the merits of those claims were at issue "creat[ed] a manifest injustice." Pl.'s Mem. of Law at 3.

Mrs. Grancio's argument that the Court misapprehended the procedural posture of the case is belied by the following colloquy between the Court and the United States's counsel at oral argument:

THE COURT: If I were to grant qualified immunity to DeVecchio and Favo— I don't know whether I will at this point in the litigation or not—where does that leave the Government? You've only moved to dismiss for failure to exhaust

and on statute of limitations, and if you lose that and then there is qualified immunity [for DeVecchio and Favo], where are you now? Are you still in the case?

MS. MATTHEWS: Yes, Your Honor. But what we would do is we would basically reassert all of the same information and move for summary judgment on the tort case.

Tr. of Mar. 20, 2008, at 47. Thus, the Court was well aware that the Government's motion did not address the merits of the FTCA claims; however, the colloquy continued:

THE COURT: You can move for summary judgment at this time, too, right?

MS. MATTHEWS: We could, Your Honor, but as set forth in point one, it clearly states that plaintiff failed to exhaust. And just one more—

THE COURT: You're not going to win on that. You could move for summary judgment in the alternative. You could have done that.

MS. MATTHEWS: I did. I joined [DeVecchio and Favo's] papers. The Government joined the papers.

THE COURT: Basically, I can view your papers as also summary judgment on the merits of the case?

MS. MATTHEWS: Absolutely, Your Honor. My Notice of Motion was to dismiss the—

THE COURT: I got the procedural context. Anyone else want to say anything before we adjourn?

*Id.* at 47–48.

The Court's purpose in clarifying the procedural context of the case at oral argument was to avoid piecemeal litigation and resolve, as far as possible, issues common to all defendants while preserving Mrs. Grancio's right to "a reasonable opportunity to meet facts outside the pleadings." *Groden v. Random House, Inc.,* 61 F.3d 1045, 1053 (2d Cir.1995) (citation and internal quotation marks omitted). It would be a complete waste of judicial resources to hold that Mrs. Grancio had failed to adduce sufficient evidence to support her *Bivens* claims only to have the United States argue in a subsequent motion that the very same lack of evidence mandated summary judgment on her FTCA claims.

At oral argument, Mrs. Grancio's counsel raised no objection to the Court's considering the government's motion as seeking summary judgment on the merits of the FTCA claims. He now argues, however, that the government's assertion that it had joined DeVecchio and Favo's papers was incorrect, and that it had only adopted Favo's response to her statement of material facts in dispute. *See* United States's Reply Statement of Facts ¶ 51.

Be that as it may, there can be no doubt that DeVecchio and Favo's motions put Mrs. Grancio on notice that she would have to come forward with evidence that those defendants directly aided and abetted the murder of her husband. Her inability to do so is fatal to *any* claim, whether asserted under *Bivens* or the FTCA, based on that theory.

## B. Plaintiff's Theories of Liability.

Mrs. Grancio next takes issue with the Court's statement that "central to the merits of all of Mrs. Grancio's claims is her contention that DeVecchio and Favo played a role in her husband's murder by terminating the surveillance on him in response to a request from Scarpa." *Grancio,* 572 F.Supp.2d at 311. She argues that

the various cognizable legal theories for relief under *Bivens,* going well beyond just a claim of direct involvement in the murder from the Scarpa phone call, are set forth and the Court has overlooked all of those other claims in its dismissal

of the case in its entirety, reflecting clear error resulting in a manifest injustice.

Pl.'s Mem. of Law at 6. She also objects to the similar construction of her FTCA claims. *See id.* at 5 ("The FTCA claims are not all at all [sic] based on the facts the Court felt lacking such as to justify granting summary judgment on other claims in the case[.]").

Contrary to Mrs. Grancio's assertion, the Court understood that her Amended Complaint alleged numerous theories of liability under both *Bivens* and the FTCA. During the course of the litigation, however, her counsel substantially narrowed the focus of her claims: In responding to the defendants' statute of limitations argument, he stated:

> [The] facts, as alleged in [the] First Amended Complaint, are specifically that Scarpa saw law enforcement surveillance on his target, Nicky Grancio, then he called DeVecchio, his FBI handler, demanded that the surveillance be lifted, achieved that result through DeVecchio's actions and from Favo's radio call, and then (and only then[) ] was able to move in and kill Grancio with impunity. These are the operative and necessary facts to link the government to the murder and they simply were not reflected in any media report to which the USA refers.

Pl.'s Consol. Mem. in Opp. to Defs.' Mots. to Dismiss, etc., at 22. Similarly, in response to DeVecchio and Favo's arguments on the *Bivens* claims, he asserted:

> [I]t is, in a word, "ridiculous" to even suggest that in 1992, any law enforcement officer or any other reasonable person somehow would think it was permissible to assist in or facilitate a murder or give license to kill with impunity, or leak confidential information to a killer, or cover-up the same, all while knowing that the killer was so operating and

that the victim was a known and immediate target. The clearly established right to be free from being so murdered through the help of law enforcement officers has been established since the time of the Ten Commandments and certainly was by 1992.

\* \* \*

The allegations in the First Amended Complaint, which must be taken as true (with all reasonable inferences flowing therefrom drawn in Mrs. Grancio's favor) clearly establish these Defendants' direct involvement in the murder of Nicholas Grancio in concert with Scarpa their informant and, demonstrate unequivocally a violation of the by then clearly established right to be free from cold-blooded murder at the hands of law enforcement and its informant.

*Id.* at 36–37.

Little wonder, then, that at oral argument, the Court described Mrs. Grancio's "key theory" as whether "DeVecchio removed law enforcement surveillance of her husband and that he effectuated that removal." Tr. of Mar. 20, 2008, at 9. Mrs. Grancio's counsel did not contradict that description; indeed, he stated at the conclusion of the argument that he "agree[d] that the allegations in this case are about what happened—with respect to Grancio, what happened on that day that Grancio was killed." *Id.* at 60.

Thus, while Mrs. Grancio is certainly correct that the July 24th M & O dealt solely with the claim that DeVecchio, at Scarpa's request, ordered Favo to remove surveillance from Grancio, it did so based on her counsel's own characterization of the case. It was, moreover, a characterization that yielded some measure of success: The Court held that Mrs. Grancio was not put on notice, for statute of limitations purposes, by media reports alleging

an improper relationship between DeVecchio and Scarpa because "the media coverage ... lacks a 'smoking gun' connection between DeVecchio and Grancio's murder." *Grancio*, 572 F.Supp.2d at 309. Furthermore, as the Court observed at oral argument, it is clearly established that the Fifth Amendment "doesn't allow people to kill people." Tr. of Mar. 20, 2008, at 30; *see Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) ("One embodiment of this ... claim for relief from excessive force based in Due Process is the situation in which a state actor aids and abets a private party in subjecting a citizen to unwarranted physical harm."); *McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992) ("It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books."). The Court is quite confident that New York tort law does not countenance the intentional aiding and abetting of murder, either. In sum, by focusing on the theory that DeVecchio and Favo had intentionally aided and abetted Scarpa in murdering her husband, Mrs. Grancio defeated defendants' statute of limitations and qualified immunity arguments; the only obstacle to this "key theory" of liability was the lack of evidence to support it.

In every case, there comes a time when the Court must cull the wheat from the chaff, and it expects the forthright assistance of counsel in its task. Nevertheless,

the Court cannot say that Mrs. Grancio unequivocally abandoned her other theories of liability. *Cf. Abrahams v. Young & Rubicam, Inc.,* 79 F.3d 234, 237 n. 2 (2d Cir.1996) ("Given Abraham's representations to the district court that he was willing to abandon the claims against Moore and the failure to make pertinent arguments here, we deem the claims waived."). The Court is also aware that arguments not vigorously pressed in the district court occasionally take on new life on appeal. For these reasons, the Court will address Mrs. Grancio's other theories.

 Once intentionally aiding and abetting murder is removed from the equation, the available grounds for relief under either *Bivens* or the FTCA are considerably narrowed. "As a general matter ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).[1] Similarly, New York common law—which supplies the substantive law for Mrs. Grancio's FTCA claims—"does not impose a duty to control the conduct of third persons to prevent them from causing injury to others," even where "as a practical matter defendant could have exercised such control." *Purdy v. Public Adm'r of Westchester County,* 72 N.Y.2d 1, 8, 530 N.Y.S.2d 513, 526 N.E.2d 4 (1988) (citations and internal quotation marks omitted).

---

1. To forestall any further claim of oversight, the Court notes that it has considered Mrs. Grancio's claims under the Fourth and Eighth Amendments and rejects them as meritless. There is no claim that Grancio's death occurred in the course of an unreasonable search or seizure, *see County of Sacramento v. Lewis,* 523 U.S. 833, 843–44, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (holding that high-speed chase resulting in death was not a

search or seizure), and the prohibition on cruel and unusual punishment does not apply "until after [the government] has secured a formal adjudication of guilt in accordance with due process of law," *Ingraham v. Wright,* 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (holding that Eighth Amendment did not apply to corporal discipline in public school).

Both rules of law are subject to two roughly analogous, though not identical, exceptions. To prevail, Mrs. Grancio's claims must fall within one or both of those exceptions.

### 1. Special Relationship/Duty to Protect

As a matter of constitutional law, "the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a 'special relationship' with the victim." *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir.2008) (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir.1993)). Similarly, New York law imposes a duty when there is a "a relationship between the defendant and plaintiff requiring defendant to protect the plaintiff from the conduct of others." *Purdy*, 72 N.Y.2d at 8, 530 N.Y.S.2d 513, 526 N.E.2d 4.

There is no claim that DeVecchio and Favo had *any* relationship with Grancio, let alone the type of relationship from which courts have derived a duty to protect. *See Matican*, 524 F.3d at 156 ("[T]he duty arises solely from 'the State's affirmative act of restraining the individual's freedom to act on his own behalf [ ] through incarceration, institutionalization, or other similar restraint of personal liberty.'" (quoting *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998)); *see also* Restatement (Second) of Torts § 314A(4) ("One who is required by law or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.").

### 2. State–Created Danger/Duty to Control

In addition to a duty to protect those in its custody, "the state may owe a [Due Process] obligation if its agents 'in some way had assisted in creating or increasing the danger to the victim.'" *Matican*, 524 F.3d at 155 (quoting *Dwares v.*

*City of New York*, 985 F.2d 94, 98–99 (2d Cir.1993)). Under New York law, liability exists "where there is a special relationship ... between defendant and a third person whose actions expose plaintiff to harm such as would require the defendant to attempt to control the third person's conduct." *Purdy*, 72 N.Y.2d at 8, 530 N.Y.S.2d 513, 526 N.E.2d 4.

In *Dwares*, the plaintiffs alleged that police officers had assured a group of "skinheads" threatening to disrupt a protest "that unless they got totally out of control they would not be impeded or arrested." 985 F.2d at 99. The Second Circuit concluded that "[i]t requires no stretch to infer that such prior assurances would have increased the likelihood that the 'skinheads' would assault demonstrators," and that "[s]uch a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause." *Id.* By that logic, turning a blind eye to Scarpa's criminal conduct—giving him what Mrs. Grancio describes as a "license to kill"—would also constitute an action that "assisted in creating or increasing the danger to the victim." *Dwares*, 985 F.2d at 99. Although no New York case has directly addressed the issue, one could also plausibly argue that the relationship between a law-enforcement officer and his confidential informant gives rise to a duty to control the latter's behavior, at least in the face of a known and specific risk. *See Wagshall v. Wagshall*, 148 A.D.2d 445, 538 N.Y.S.2d 597, 598 (2d Dep't 1989) ("Liability has been found only where the defendant had the ability to control the actions of a person known to be violent.").

However, the Court need not determine whether Mrs. Grancio could, with or without full discovery, establish that DeVecchio and Favo's alleged acts and omissions fall within the "state-created danger" excep-

tion to *DeShaney* or breached a tort-law duty to control Scarpa's behavior. Instead, the issues originally raised by the defendants—namely, qualified immunity (with respect to DeVecchio and Favo) and the statute of limitations (with respect to the United States)—are dispositive.

### a. Qualified Immunity

■ A government official is entitled to qualified immunity "if he did not violate clearly established law *or* it was objectively reasonable for him to believe that he was not violating clearly established law." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful,'" *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.1998)); "[w]hen neither the Supreme Court nor [the Second Circuit] has recognized a right, the law of [other] circuits and the holdings of district courts cannot act to render that right clearly established within the Second Circuit." *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir.2006).

■ As the Court observed at oral argument, it agrees with Mrs. Grancio that no reasonable officer could conclude that he could constitutionally aid and abet a murder. But the same does not hold true for the claim that the Due Process Clause prohibits officers from "sanction[ing] privately inflicted injury." *Dwares*, 985 F.2d at 99. In *Estate of Rosenbaum v. City of New York*, 975 F.Supp. 206 (E.D.N.Y. 1997), the Court exhaustively surveyed the relevant case law and concluded that "the state-created danger theory was not clearly established" until *Dwares* was decided in February 1993. *Id.* at 221. Since

Grancio's murder took place more than a year earlier, DeVecchio and Favo are entitled to qualified immunity.

### b. Statute of Limitations

■ The legal framework for the government's statute of limitations argument is set forth in the July 24th M & O. To summarize, "a claim under the Federal Tort Claims Act accrues on the date that a plaintiff discovers that he has been injured," except "where plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted," *Grancio*, 572 F.Supp.2d at 307 (quoting *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177 (2d Cir.2008)); in such cases, "accrual may be postponed until the plaintiff has or with reasonable discovery should have discovered the critical facts of both his injury and its cause." *Id.* "[W]idespread publicity can trigger inquiry notice for statute of limitations purposes." *Id.* at 308.

When the focus was on Mrs. Grancio's claim that, at Scarpa's request, DeVecchio directed Favo to remove the surveillance on Grancio, the Court concluded that "the media coverage of the allegedly improper relationship between DeVecchio and Scarpa was too generalized to put a reasonable person on notice of a possible link between DeVecchio and Grancio's murder." *Id.* at 309. The analysis changes, however, if the claims are divorced from this specific operative fact because, as set forth below, the media coverage *was* sufficient to put a reasonable person on notice of the possibility that DeVecchio and the FBI were, quite literally, letting Scarpa get away with murder.

The news of an allegedly improper relationship between Scarpa and DeVecchio broke in late 1994, in connection with the trial of seven members of the Orena faction. *See, e.g., New York Daily News*, Oct.

13, 1994 ("A law enforcement source known as 'the Girlfriend' [whom the article identified as DeVecchio] may have given Scarpa the addresses of rivals he wanted killed in exchange for his cooperation."); *New York Times,* Nov. 20, 1994 ("The disclosures [of the relationship] have also raised questions about whether the FBI funneled confidential information to Mr. Scarpa and immunized him from a prison sentence for decades."). When the trial began in the spring of 1995, reports of the relationship became frequent and more detailed:

- *New York Times,* May 9, 1995:
 The defense lawyers contend that the FBI used Mr. Scarpa as an agent provocateur to foment violence in the Colombo family. . . . In January 1992 Mr. DeVecchio told Mr. Scarpa that Victor Orena, the head of one of the factions of the Colombo family, was staying at his girlfriend's house. Mr. Scarpa was known to be hunting for Mr. Orena. . . . Mr. DeVecchio alerted Mr. Scarpa in June 1992 that two of his closest associates [Mazza and Delmasto] were about to be arrested.

- *New York Daily News,* May 10, 1995:
 The feds believe that DeVecchio, ex-head of the FBI's Colombo unit, leaked critical information to the homicidal Scarpa on at least eight occasions. . . . Defense attorneys say Scarpa waged the war himself with the FBI's permission. . . . The feds left Scarpa out on the street despite information from [another informant] that Scarpa had bragged about participating in the attempted murder of Joel (Waverly) Cacace.

- *New York Daily News,* May 11, 1995:
 In opening statements [at the trial] the defense argued the FBI gave Scarpa a pass to commit crime. . . . Prosecutors acknowledge Scarpa's FBI handler, Agent R. Lindley De-Vecchio, may have leaked information to his key source and warned him of impending indictments. But the FBI knew even more. On Jan 12, 1992, for instance, agents admit they knew Scarpa had shotgunned rival gangster Nicky Grancio in the head. During his months on the lam, he met secretly with DeVecchio six times. DeVecchio never turned him in.

- *Newsday,* May 29, 1995:
 Defense lawyer Gerald Shargel . . . has called DeVecchio a "rogue agent" who helped provoke the war by providing valuable information to Scarpa about his rivals' whereabouts. . . . Scarpa actually spoke to DeVecchio the day the mobster murdered Nicholas Grancio.

- *Newsday,* June 4, 1995:
 Scarpa had better reason for assurance that, by gulling DeVecchio, he could earn himself a judgment-proof license to kill.

- *New York Times,* July 1, 1995:
 [Following the acquittal of the seven Orena defendants, o]ne juror added that the pivotal moment was when they showed the sheet of the conversations with DeVecchio and Scarpa. It showed that Scarpa was basically running free. . . . Defense lawyers said their clients were forced to protect themselves from Mr. Scarpa while Mr. DeVecchio shielded the informer. . . . Mr. Scarpa, [a defense attorney] added, killed six in the Orena faction. The defense argued that the murders were helped by Mr. Scarpa's relationship with Mr. DeVecchio.
 Charges by other agents that Mr. DeVecchio, too, was a mole, providing confidential information to Mr. Scarpa that helped him to evade arrests and to track down rivals in a mob war. . . . That Mr. DeVecchio, seeking to gen-

erate evidence for arrests, had used Mr. Scarpa to foment the Colombo war from 1991 to 1993.... The war left at least 10 men dead and 14 wounded.

[Favo] said he that in May 1992 Mr. DeVecchio had seemed pleased and had pounded his desk in apparent delight when he learned that two rivals of Mr. Scarpa had been shot, as if Mr. DeVecchio was favoring one of the factions in the Colombo war.

In sum, widespread media coverage in mid–1995 alleged that DeVecchio had allowed Scarpa to hunt down his rivals in the Orena faction with impunity, and had even fomented the Orena–Persico war in the first place. While the Grancio murder was mentioned only sporadically, there is no question but that the death of Grancio—a known member of the Orena faction and one of Scarpa's targets—was part of the larger conflict.

 The issue is not whether Mrs. Grancio read any of the articles; as the First Circuit aptly observed in *Rakes v. United States,* 442 F.3d 7 (1st Cir.2006), "at some point, facts achieve a local notoriety great enough that the only practicable course is to attribute knowledge of them to people in a position to become familiar with them." *Id.* at 20. Nor is the truth of the allegations or their denial by the FBI and DeVecchio relevant; the inquiry is not whether Mrs. Grancio had enough information to build a watertight case, but whether she had enough information to assert a claim to test her allegations. *See Kronisch v. United States,* 150 F.3d 112, 123 (2d Cir.1998) ("[A] claim will accrue when the plaintiff knows, or should know,

enough of the critical facts of injury and causation to protect himself by seeking legal advice.") (quoting *Guccione v. United States,* 670 F.Supp. 527, 536 (S.D.N.Y. 1987)). While Mrs. Grancio may not, as explained in the July 24th M & O, have had reason to believe that the surveillance of her husband had been removed, the conclusion is inescapable that a reasonable person in Mrs. Grancio's position should have known enough to make a connection between her husband's death ·and the allegedly improper relationship between Scarpa and DeVecchio. Therefore, other than the claims based on the removal of surveillance, her claims accrued no later than 1995 and are, accordingly, time-barred.[2]

## II. Motion for Relief from Judgment

As noted, Mrs. Grancio also moves for relief from judgment. Federal Rule of Civil Procedure 60(b) authorizes such relief from judgment in limited circumstances, including, as pertinent here, the discovery of new evidence that could not have been obtained earlier "with reasonable diligence." Fed.R.Civ.P. 60(b)(2). A Rule 60(b) motion is not to be used to relitigate the merits of issues already decided, or as a substitute for an appeal. *See Nemaizer v. Baker,* 793 F.2d 58, 61 (2d Cir.1986).

Mrs. Grancio asserts that recent statements from Mazza constitute newly discovered evidence sufficient to overcome summary judgment or warrant additional discovery. More specifically, she alleges that

> since the motions were submitted, Mazza for the first time reached out to [her

---

**2.** *Bivens* claims are subject to a three-year statute of limitations, but are otherwise subject to the same rules of accrual as FTCA claims. *See Grancio,* 572 F.Supp.2d at 309 n. 4. Accordingly, the Court holds that even if DeVecchio and Favo were not entitled to

qualified immunity, the *Bivens* claims against them would be time-barred insofar as they are based on Mrs. Grancio's contention that DeVecchio and Favo encouraged or failed to control Scarpa's unlawful activities.

counsel], after refusing at all times previously to speak with or help [him] and advised that he told law enforcement investigating this matter from the very start (when they asked him repeatedly if he didn't think it was odd that surveillance was pulled off of Grancio before the murder and otherwise) that he believed Scarpa called Devecchio from his (Mazza's sister's) phone in advance to make sure the streets were clear of surveillance—and not from the car after seeing Grancio, since Grancio was just one of their targets that day—and that he had implored law enforcement to pull his sister's phone records to show the timing of the call.

Pl.'s Mem. of Law at 10–11.[3]

Defendants dispute whether these statements are "newly discovered," noting that prior submissions from Mrs. Grancio's counsel included an email from Mazza cryptically inquiring, "It was my sister[']s phone? ? ?" Ex. to Letter from David I. Schoen (Mar. 28, 2008); *see also* Tr. of Mar. 20, 2008, at 41 ("MR. SCHOEN: And what [Mazza] says is, why didn't they check my sister's phone because that's where Scarpa—"). The Court need not reach that issue, however. Leaving aside their unattested nature, Mazza's recent statements suffer from the same problem as his previous affidavit: They do not "suggest that Mazza is prepared to recant his sworn testimony in *Orena* that there was no time to make any phone calls between Scarpa's crew's fortuitous discovery of Grancio and his murder." *Grancio*, 572

F.Supp.2d at 312. Thus, it is of no moment that Scarpa called DeVecchio—whether from his cell phone or Mazza's sister's phone—at some earlier time.

### III. Conclusion

Nothing in Mrs. Grancio's motions convinces the Court that it erred in holding that she has failed to adduce sufficient evidence to support her allegation that DeVecchio directed Favo to remove the surveillance from Grancio in response to a request from Scarpa. Although Mrs. Grancio is correct that the July 24th M & O did not address claims not dependent on that allegation, the fact remains that those claims must also be dismissed, albeit based on qualified immunity and the statute of limitations, rather than for lack of evidence. Accordingly, Mrs. Grancio's motions are denied.

**SO ORDERED.**

---

**3.** Mrs. Grancio's counsel has also submitted a report from the special prosecutor assigned to investigate whether Linda Schiro ("Schiro"), the witness who so abruptly changed her story during DeVecchio's 2007 criminal trial, should be charged with perjury. *See* Ex. to Letter from David I. Schoen (Jan. 16, 2009). He concedes, however, that the report—which is often critical of the investigations into the relationship between DeVecchio and Scarpa—is only pertinent "to the extent the Court commented on and seems to be impressed to some end that the dismissal of the criminal charges against DeVecchio is relevant," Pl.'s Mem. of Law. at 7–8. The dismissal of those charges—which did not include Grancio's murder—had no bearing on the Court's conclusions in this case.