ESTATE OF Yankel ROSENBAUM, by Samuel PLOTKIN, Public Administrator of the County of Kings, The Crown Heights Jewish Community Council, Carol Adelstein, Steven Adelstein, Yossi Alon, Yosef Altein, Isaac Bitton, Yechiel Bitton, Joseph Chenzin, Bruce Emmer, Sudarshan Jagga, Sarah Keller, Noson Kopel, Howard Kupchin, Harvey Lang, Ida Lefkowitz, Rose Marie Libassi, Chana Lipkind, Nechama Lipkind, David Michel, Menachem Piekarski, Jacob Pinson, Arie Prager, Allen Schwartz, Menachem Shagalow, Mordechai Shus-

terman, Michael Simon, William Welis, Zehava Welis, Yeshiva Chanoch Lenaar, Congregation B'nai Solomon Zalman of Crown Heights, Inc., on behalf of the themselves and others similarly situated, Plaintiffs,

v.

The CITY OF NEW YORK, David N. Dinkins, Individually and as Mayor of the City of New York, and Lee Brown, Defendants.

No. 92–CV–5414(FB).

United States District Court,
E.D. New York.

Aug. 22, 1997.

---

Snitow & Pauley (Franklin H. Snitow, of counsel), New York City, for all Plaintiffs except Isaac and Yechiel Bitton.

Stillman & Friedman, P.C. (John B. Harris, of counsel), New York City, for Defendants Dinkins and Brown.

## MEMORANDUM AND ORDER

BLOCK, District Judge:

This action, seeking relief pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 and a variety of State causes of action, arises out of the unrest that gripped the Crown Heights neighborhood of Brooklyn between Monday,

August 19 and Thursday, August 22, 1991, after an automobile escorting the late Lubavitcher Rebbe Menachem Schneerson ("Rebbe Schneerson") accidentally struck and killed seven-year-old Gavin Cato ("Cato"). Within hours of Cato's death, Australian rabbinical student Yankel Rosenbaum ("Rosenbaum") was attacked by a group of young African–American men and stabbed to death. The plaintiffs, in the main, are members of the Crown Heights Hasidic Jewish community.[1] They contend that they sustained personal injury and property damage because defendant City of New York ("City") failed to provide adequate police protection to quell the disturbances that followed in the wake of Cato's death.[2] Plaintiffs also contend that the City deliberately withheld police protection from the Hasidic community for discriminatory reasons.

In addition to suing the City, plaintiffs also seek to hold former City Mayor David N. Dinkins ("Dinkins") and former City Police Commissioner Lee Brown ("Brown") individually accountable.[3] Dinkins and Brown now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in respect to the federal claims on the ground of qualified immunity. While the Court recognizes that plaintiffs' complaint implicates both substantive due process and equal protection rights, the application of well-established principles of qualified immunity requires the grant of the motion.

## I. BACKGROUND

### A. The Underlying Incident

The Court draws the following facts from the parties' statements of uncontested facts pursuant to Local Rule 56.1,[4] as well as the extensive record in this case. Unless otherwise indicated, these facts are undisputed.

At approximately 8:20 PM on Monday, August 19, 1991, a station wagon driven by Joseph Lifsch ("Lifsch") collided with another vehicle at the intersection of President Street and Utica Avenue in Crown Heights, veered out of control, and struck Cato and his nine-year-old cousin Angela Cato. Cato was killed and Angela Cato was seriously injured. The station wagon was part of a police-led motorcade accompanying Rebbe Schneerson, since deceased.

Less than five minutes after the accident, an ambulance from a private Jewish organization known as Hatzoloh arrived at the scene. A New York City Emergency Medical Services ("EMS") ambulance arrived shortly thereafter. A group of African–Americans gathered at the site of the accident, and several men physically assaulted Lifsch and two passengers in the station wagon. A police officer at the scene directed the Hatzoloh ambulance driver to take Lifsch and these passengers to the hospital. The EMS ambulance took the Cato children to Kings County Hospital, where Cato was pronounced dead.

### B. The Community Reaction and the Police Response

The accident sparked an immediate and violent reaction among certain members of the African–American community, which quickly spread to the streets of Crown Heights. The reaction appears in part to have been generated by the perception that the Hasidic community received preferential treatment from the City, a perception that was strengthened by the police escort rou-

1. Plaintiffs also include Rosenbaum's Estate, three not-for-profit corporations (Crown Heights Jewish Community Council, Yeshiva Chanoch Lenaar, and Congregation B'nai Solomon Zalman of Crown Heights, Inc.), and two individuals (Sudarshan Jagga and Rose Marie Libassi) who are not identified as Hasidic Jews.

2. All plaintiffs except Isaac and Yechiel Bitton are represented by the law firm of Snitow & Pauley, which has submitted papers in opposition to the motion. Plaintiffs Isaac and Yechiel Bitton, who were formerly represented by Snitow & Pauley and are now represented by Chana

Sklar Israel, have not submitted papers. The Court will nonetheless use the term "plaintiffs" throughout this Memorandum and Order, although it recognizes that counsel for the Bitton plaintiffs has chosen not to participate in the motion.

3. Dinkins is sued both individually and in his official capacity. Brown is only sued in his individual capacity.

4. Formerly Rule 3(g). Local Rule 56.1 became effective on April 15, 1997.

tinely given Rebbe Schneerson, the Hasidic community's religious leader. The violence also appears to have been attributable to the spread of a wholly unjustified rumor that the Hatzoloh ambulance had failed to render aid to the seriously injured black children and had favored the less-injured Hasidic driver and passengers. At approximately 9:00 PM, less than an hour after the accident, an African–American male was arrested for firing at a group of police officers. At 11:45 PM, Rosenbaum was stabbed in the chest. Although initially expected to survive his attack, Rosenbaum died several hours later. Lemrick Nelson was arrested and charged with Rosenbaum's murder.

Participants in the unrest pelted police cars with rocks and other projectiles. A group of African–American men allegedly burned a van owned by plaintiff Yeshiva Chanoch Lenaar ("Yeshiva") and occupied the Yeshiva's courtyard at 876 Eastern Parkway. In one of several affidavits submitted in opposition to Dinkins and Brown's motion, non-party Robert Bush states that from his window he saw police officers escorting a crowd of African–Americans and observed that the officers refused to make arrests, despite the fact that members of the crowd were hurling bricks and other items at Hasidic-owned homes. At approximately 3:00 AM, a police car parked on Eastern Parkway was set on fire. At 4:45 AM, the police dispersed a large group of Hasidic Jews and African–Americans and the disturbances quieted for a time.

More than three hundred police personnel were dispatched to Crown Heights that night in response to the outbreaks of violence. At his deposition, Chief Thomas Gallagher ("Gallagher"), Commander of Patrol Borough Brooklyn South of the New York City Police Department ("Police Department"), testified that he pursued a policy of saturating the neighborhood with police and attempting to keep apart groups of African–Americans and Hasidic Jews. He discouraged officers from making arrests for what he termed "minor" crimes, such as unlawful assembly, because in his view such arrests would have exacerbated the situation. He also testified that there was a decision from the outset not to make mass arrests and not to engage in aggressive crowd control tactics, and that this decision was communicated to officers under his command. He stated that this decision was based upon a fear that an overly aggressive approach would cause the unrest to spread outside of Crown Heights to other areas of the City.

On Tuesday, August 20, more than one thousand police officers were sent to Crown Heights. Deputy Mayor William Lynch ("Lynch") presided over a heated community outreach meeting at P.S. 167, which was largely attended by African–Americans. At this meeting, certain members of the African–American community charged that the Hasidic community was receiving preferential treatment from the City and, moreover, indicated their belief that violence against the police and the Hasidic community would continue. Later that day, African–American demonstrators gathered in Crown Heights at the intersection of President Street and Utica Avenue. At approximately 4:00 PM, a group of African–American activists met with Gallagher and demanded that Lifsch be arrested for homicide and that police officers who had allegedly physically assaulted Cato's father be immediately suspended. After Gallagher refused to accede to either of these requests, the activists participated in a demonstration in front of the 71st Precinct station house, which demonstration later moved to the President Street and Utica Avenue intersection. At its peak, approximately 350 people were involved in the demonstration, which grew increasingly out of control. Certain of the demonstrators threw rocks and bottles at the police and blocked traffic, and it is beyond dispute that many were yelling anti-Semitic epithets.

Violence against private targets in the Hasidic community continued as well on that day. Plaintiffs Nechama Lipkind ("Lipkind") and Isaac Bitton ("Bitton") were seriously injured. Lipkind was surrounded by a group of African–Americans shouting anti-Semitic epithets as she walked home. After she arrived, they threw bricks and rocks through her windows and caused her to sustain a concussion. Lipkind states that police officers stood less than five feet away during her

initial confrontation but turned away in order to avoid becoming involved. In an affidavit, Bitton[5] states that he and his son were dropped off at a corner of Carroll Street and Schenectady Avenue. According to Bitton, he asked police officers stationed there whether it was safe to proceed down Schenectady Avenue and he was told that because police were in the area, it would be safe to walk. He states that as he reached the middle of Schenectady Avenue, he and his son were surrounded by a group of African–American youths chanting "Jew, Jew, Jew," and that nearby police officers did not intervene as the crowd surrounded Bitton and his son and beat them with fists, bricks and bottles.

Plaintiffs also include an affidavit from non-party Sol Drimmer ("Drimmer"), a Crown Heights resident, who states that on that day he was caught in the middle of a disturbance involving approximately 250 African–Americans chanting anti-Semitic slogans. He recounts that despite the presence of a police barricade, demonstrators threw rocks and bottles over the heads of the police officers toward a group of Hasidic Jews. He claims that the police pushed the Hasidic Jews back and took no action to stop the rock and bottle throwing, which then intensified. According to Drimmer, the police ultimately fled the scene, leaving the Hasidic Jews unprotected. Plaintiffs also submit an affidavit from non-party Jacqueline Kupfer ("Kupfer"), wherein she states that ten to fifteen African–Americans entered the courtyard of her apartment building and threw objects at the building while chanting anti-Semitic epithets. They then entered the building and pounded on the doors of the apartments in an attempt to break in. Kupfer states that she called the police, but was told that they could not be everywhere. She also states that because of the fear she experienced during this incident, she suffered a miscarriage.

Much of the community violence was directed at the police. The police log shows that at approximately 5:00 PM on Tuesday there was a clash between some 200 African–Americans and Hasidic Jews and that Hasidic Jews threw bottles at the police, resulting in the arrest of one Hasidic Jew. During a particularly intense throwing of rocks and bottles at a corner of President Street and Utica Avenue, Gallagher directed police officers to fall back to avoid injury. Ten officers were injured as the result of that incident, including one officer who suffered a fractured leg. Thirty-five police officers were injured in the line of duty that day, and eight Police Department vehicles were damaged, including two that were set on fire.

Demonstrators also engaged in looting. At 9:45 PM that evening, the Utica Gold Exchange, a jewelry store, was firebombed and three firefighters were injured fighting the blaze. At 10:00 PM, a group of African–American males forced open the gates in front of the Sneaker City store on Utica Avenue and stole sneakers and clothing. Also at that time, Jamaica Gold, a jewelry store located on Utica Avenue, was burglarized. All told, seventeen arrests were made on Tuesday, August 20, including six for assault, one for riot and seven for burglaries arising out of the Sneaker City incident. The street violence quieted after heavy rains fell that evening.

The violence continued on Wednesday, August 21. There were further demonstrations led by African–American activists which eventually resulted in a clash between the demonstrators and Hasidic Jews. Throughout the day, rock and bottle throwing, often directed at the police, continued, as did sporadic clashes between groups of African–Americans and Hasidic Jews. More than 1400 police officers were sent into Crown Heights, and thirty-four arrests were effected, including nine for assault, one for inciting to riot, and six for riot. Forty-nine police officers were injured, including eight officers who were struck by shotgun pellets being fired from the roof of a building at a corner of Schenectady Avenue and Empire Boulevard.

## C. The Change in Police Strategy

In an affidavit submitted in support of the motion, Dinkins states that on Wednesday, concerned with reports that the violence against the Hasidic community had not ended by the third day and that eight police officers had been shot in the Crown Heights neighborhood that day, he met with Brown and other senior officials and told them that the existing police strategy of simply saturating the neighborhood with increasing numbers of police officers was not working. Brown states in an affidavit that it also became clear to him that day that the police strategy was proving ineffective and that changes had to be made. As part of this process, he directed that the command center be moved from the precinct to the zone headquarters, that a 24–hour command post be opened at 1 Police Plaza in order to monitor the entire City, and that First Deputy Commissioner Raymond Kelly ("Kelly") finalize a strategy to deal with the continuing violence in Crown Heights. Brown ultimately approved a plan designed by top commanders that was intended to make the police response more mobile in order to address the problem of violent groups that were breaking off from the larger demonstrations and engaging in random acts of violence against the Hasidic community.

On Thursday, August 22, the Police Department implemented the more mobile police strategy. The Crown Heights neighborhood was divided into zones and mounted police and officers on motorcycles were introduced into the area. The number of fixed posts within the community was increased, and demonstrations were restricted to confined areas so that it would be easier to arrest individuals who broke off from the demonstrations. A helicopter was also sent to monitor the area. Approximately 2000 police officers were sent into the neighborhood and sixty-two arrests were made. For the first time during the disturbances, police officers arrested individuals for unlawful assembly, which Kelly testified "has always been a part of the disorder control literature that you see." Deposition of Raymond Kelly ("Kelly Dep.") at 59. Fifty such arrests were made. Additionally, twenty-four summonses

were served for disorderly conduct and four for City Administrative Code violations. The new response was highly effective in quelling the violence which, as a practical matter, ended that day.

## D. Dinkins and Brown's Involvement During the Disturbances

Dinkins and Brown deny personal responsibility for formulating the specific law enforcement strategy that was implemented in the wake of Cato's death on Monday, August 19. In his affidavit, Dinkins states:

> Although as Mayor I accepted the ultimate responsibility of running the City, I did not formulate police strategy in this matter and I did not approve specific tactics or deployment. I was not consulted about police strategy. As Mayor, I relied by necessity upon the professional expertise of police commanders in quelling violent situations and in keeping the peace; I neither expected to receive, nor did I receive, details as to how officers were being deployed, what maneuvers or formations they were engaged in or what they were told about how to police the streets. I did not view it as my role to interfere with police strategic matters.

Affidavit of David N. Dinkins ("Dinkins Aff.") at ¶ 8. Dinkins relates that he relied upon his colleagues, including Deputy Mayor Milton Mollen ("Mollen"), to make sure that the City had the resources available to permit the police to quell the disturbances. He denies having given any order for the police to withhold protection from the Hasidic community, and further denies having been aware that any such order existed.

During the disturbances, Dinkins devoted a substantial portion of his time to meeting with members of both the Hasidic and African–American communities. Shortly after Cato's death, Dinkins was notified of the outbreak of violence in Crown Heights and went to Kings County Hospital to meet with the Cato family. He learned of the attack on Rosenbaum and visited him before his death. Dinkins, together with Brown, Mollen and Lynch, discussed the escalating Crown Heights racial tensions, and Dinkins met briefly with police officials before heading to

the 71st Precinct to meet with community leaders and local officials.

On Tuesday morning, Dinkins, Brown, Mollen and Acting Chief Joseph Borelli ("Borelli") of the Police Department appeared at a press conference. Dinkins stated that he was working with community leaders and City officials to restore calm to the community. The bulk of the questions fielded at the press conference related to the circumstances of the accident and the allegations that the Hasidic community received preferential treatment.

On Wednesday afternoon, Dinkins held another press conference at which he condemned the "specter of lawlessness and vigilante justice that ... no civilized society can tolerate." Dinkins Aff. at Exh. B, pg. 5. Later that afternoon, he, Mollen and Brown met with Jewish leaders regarding their charges of inadequate police protection. Following the meeting, Dinkins went to P.S. 167 to meet with African–American youth and received a hostile reception; later, as he attempted to address a crowd outside the school through a bullhorn, he was again greeted with antagonism. Dinkins went to the Cato residence later that afternoon and confronted yet another belligerent crowd that this time threw projectiles at him. After his visit to the Cato residence, Dinkins met with Hasidic leaders to discuss the violence and to address their concerns regarding the City's response to that violence. He also appeared on evening news programs and urged calm. Finally, as noted above, Dinkins met with Brown to discuss his concerns about the continuing violence and to talk about the need for devising a new police strategy.

For his part, Brown also disclaims personal responsibility for formulating the strategy employed at the beginning of the disturbances. In his affidavit, he states that, although as Police Commissioner he was the most senior police official and was responsible for overseeing police services throughout the City, he "necessarily relied on the Department's experienced personnel ... to

make on-the-spot strategic decisions in the field, to conduct investigations and to enforce the law." Affidavit of Lee P. Brown at ¶ 6. After the violence began on Monday night, he met with Gallagher to discuss the volatile situation. Brown denies having told Gallagher, Police Chief Mario Selvaggi ("Selvaggi"), Borelli or anyone else that the police should not protect Hasidic residents or property or should refrain from enforcing the law. Rather, Brown claims that he was consistently informed by police on the scene that adequate resources existed to quell the disturbances.

On Tuesday, Brown directed Gallagher to attend the community outreach meeting at P.S. 167, and Brown attended Dinkins' press conference. There, he addressed the issue of preferential treatment and the Police Department's investigation into the cause of the accident. He states that he was aware that random and sporadic violence was occurring throughout the Crown Heights neighborhood that day but believed that the additional personnel that had been brought into the neighborhood would stop the violence.

On Wednesday, Brown joined Dinkins at the press conference that afternoon and then attended a meeting with Jewish members of the Crown Heights Emergency Committee along with Mollen, Borelli, Selvaggi, Gallagher, and other City officials.[6] At that meeting, he responded to concerns that the police were not adequately protecting the Crown Heights Hasidic community. Following the meeting, he went to the 71st Precinct to meet with religious and community leaders and elected officials. Later that afternoon, he joined Dinkins at the P.S. 167 meeting. He states that while outside the school, he noticed people who had been marching in demonstrations breaking off from the larger groups and engaging in acts of violence against the police and others in the neighborhood. Brown also states that after observing these incidents, he went to the 71st Precinct and discussed with police commanders and Kelly the need to change strategy to deal with the problem of violent groups splinter-

6. It is not clear from the record whether this is the same meeting that Dinkins attended that afternoon.

**214**

ing from the larger demonstrations. He later met with Dinkins to discuss the problem of the continuing violence and, as noted above, approved implementation of the strategy that effectively brought the violence to a close.

### E. The Complaint

As amended, plaintiffs' complaint contains their 42 U.S.C. §§ 1983, 1985, and 1986 claims,[7] and eight supplemental State causes of action.[8] Plaintiffs specifically allege in respect to their federal claims that during the Crown Heights disturbances, defendants "adopted and pursued a policy, practice, custom and usage of discriminatorily and selectively denying police protective and investigative services to Jews and other non-Black persons." Amended Complaint at ¶ 144. On February 1, 1993, defendants moved for dismissal of the complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment pursuant to Federal Rule 56. Defendants also then raised the issue of qualified immunity in respect to Dinkins and Brown.[9] The Court (Raggi, J.) denied the motion, determining implicitly that plaintiffs had pleaded cognizable claims, and comment-

ing that the case was not ripe for summary judgment at that early stage because of the need for discovery.[10] See Transcript of Proceedings of April 30, 1993 at 88. Approximately four years of discovery followed. Dinkins and Brown now again seek dismissal of the federal claims on the ground of qualified immunity.[11]

## II. DISCUSSION

### A. Qualified Immunity Under § 1983

#### 1. General principles

It is well established that the elements of a claim under § 1983 are: (1) that the conduct in question deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States; and (2) that the conduct complained of was committed by a person acting under color of state law. See Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–1924, 64 L.Ed.2d 572 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604–1605, 26 L.Ed.2d 142 (1970). The Supreme Court has indicated that qualified immunity is not relevant to the existence of a claim arising under § 1983; rather, qualified immunity is simply an affirmative defense to a § 1983 action that

---

7. In addition to their claims under §§ 1983, 1985, and 1986, plaintiffs also sued under 42 U.S.C. §§ 1981, 1982, and 3617, which claims were voluntarily withdrawn pursuant to Rule 41(a) of the Federal Rules of Civil Procedure. See Order (Raggi, J.) dated May 3, 1993 ("Order") at ¶ 3.

8. The eight State causes of action are: (1) a negligence claim for personal injuries allegedly sustained by plaintiffs; (2) a claim for property damage allegedly sustained by plaintiffs; (3) a claim for wrongful death on behalf of the Rosenbaum Estate; (4) a survival claim on behalf of the Rosenbaum Estate; (5) a loss of services claim by Yechiel Bitton for injuries allegedly sustained by his father Isaac Bitton during a physical assault; (6) a claim for infliction of emotional distress by Yechiel Bitton for psychological injuries sustained after viewing Isaac Bitton's assault; (7) a claim by Isaac Bitton for loss of services based upon Yechiel Bitton's psychological injuries; and (8) a claim on behalf of all plaintiffs based upon an alleged violation of New York Civil Rights Law § 40–c (McKinney 1992).

9. At that time, Dinkins and Brown had not yet retained separate counsel and were thus represented by the City's Corporation Counsel.

10. The Court did, however, dismiss the complaint as against the Police Department because, as an agency of the City, it was not subject to separate suit. See Order at ¶ 6. The caption was amended accordingly.

11. The § 1983 claim is the first claim for relief in the Amended Complaint. The second claim in the Amended Complaint alleges violation of 42 U.S.C. § 1985 and the third claim alleges violation of § 1986. Section 1985 proscribes conspiracies that interfere with the exercise of civil rights, while § 1986 provides a cause of action based upon a failure to prevent a conspiracy to interfere with civil rights. Dinkins and Brown request dismissal of all federal claims on qualified immunity grounds. However, they only make their qualified immunity argument in the context of § 1983. Nonetheless, the Second Circuit has held that qualified immunity also exists to protect state officers alleged to have violated § 1985. See Brown v. City of Oneonta, 106 F.3d 1125, 1133 (2d Cir.1997). The Second Circuit has also held a § 1986 claim must be predicated upon a valid § 1985 claim. Id. Accordingly, the Court's qualified immunity analysis also applies to plaintiffs' §§ 1985 and 1986 claims.

must be pleaded by the defendant. *Gomez,* 446 U.S. at 640, 100 S.Ct. at 1923–1924. "A decision on qualified immunity is separate and distinct from the merits of the case. . . . Immunity contemplates exemption from liability that would otherwise exist on the merits." *Lassiter v. Alabama A & M Univ. Bd. of Trustees,* 28 F.3d 1146, 1151 (11th Cir. 1994).

■ Qualified immunity "generally shields governmental officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McEvoy v. Spencer,* 124 F.3d 92 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Qualified immunity protects government officials from the burdens of defending expensive, but ultimately insubstantial, lawsuits and also guards against the risk that "fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *see also Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

■ In *Harlow,* the United States Supreme Court defined the limits of qualified immunity in essentially objective terms by focusing on the objective reasonableness of the government official's acts, assessed in respect to the legal rules that were "clearly established" at the time that the official action was taken. 457 U.S. at 818–819, 102 S.Ct. at 2738–2739; *see also Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038–3039. Thus, even if the scope of the plaintiff's rights and the defendant's conduct were established at the time of the alleged violation, a government officer will still be protected from liability if it was objectively reasonable for the officer to believe that his or her conduct was lawful at the time of the challenged act—that is to say, if "'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon,* 66 F.3d at 420 (quoting *Malley v. Briggs,* 475 U.S. 335, 341,

106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). The Court of Appeals for the Second Circuit has specifically noted that in qualified immunity cases, "we are not concerned about the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." *Lennon,* 66 F.3d at 421.

### 2. Qualified Immunity and Summary Judgment

■ Although reasonableness is ordinarily a question of fact for the jury, this rule does not hold true when evaluating the affirmative defense of qualified immunity. *See Lennon,* 66 F.3d at 421. Provided that there are no material issues of fact, the question of whether a reasonable officer should have known that he or she acted unlawfully is a question for the Court and not for the jury and is properly resolved on a motion for summary judgment. *See Hunter v. Bryant,* 502 U.S. 224, 227–228, 112 S.Ct. 534, 536–537, 116 L.Ed.2d 589 (1991); *Davidson v. Scully,* 114 F.3d 12, 14 (2d Cir.1997); *Lennon,* 66 F.3d at 421–422; *Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir.1994), *cert. denied,* 513 U.S. 1076, 115 S.Ct. 721, 722, 130 L.Ed.2d 627 (1995); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Summary judgment is therefore appropriate if:

the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.

*Davidson,* 114 F.3d at 14 (quoting *In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir. 1996)). This rule is consistent with the oft-stated purpose behind the principle of qualified immunity—that a government officer should be immune not only from liability but from suit as well. *See, e.g., Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815–2816, 86 L.Ed.2d 411 (1985).

In support of their claim that they are entitled to qualified immunity, both Dinkins and Brown, as noted above, contend that they were not personally responsible for formulating the initial police response to the Crown Heights disturbances. They also argue that the federal claims should be dismissed against them individually because: (1) to the extent that plaintiffs claim that the police enhanced the danger to the Hasidic community, this claim did not implicate a due process right that was clearly established in 1991, when the disturbances took place; (2) even if there were a clearly established due process right at that time, they did not violate that right; and (3) they acted in an objectively reasonable manner under the facts as they then understood them to be. Plaintiffs, in response, invoking both the Due Process and Equal Protection Clauses of the Fourteenth Amendment, contend that Dinkins and Brown are not immune from suit because: (1) their conduct implicated a due process right that was clearly established in 1991; (2) a jury should determine whether they violated that right; (3) genuine issues of material fact preclude a determination that they did not act with discriminatory intent; and (4) they were personally responsible for implementation of the initial law enforcement strategy. The Court will analyze the parties' contentions first in the context of plaintiffs' due process claim and then in the context of their equal protection claim.

## B. Due Process

### 1. The Claimed Constitutional Right

Plaintiffs claim that their due process rights were violated by the City's alleged implementation of a policy of restraint from Monday, August 19 through Wednesday, August 21. Specifically, they charge that by failing to arrest individuals for unlawful assembly and by ignoring pleas for assistance both by individuals and by the community at large, the Police Department emboldened participants in the violence and increased the danger to the Hasidic community. These contentions invoke the substantive aspect of the Due Process Clause.[12] Plaintiffs seek to hold Dinkins and Brown personally responsible for the roles they allegedly played in bringing these circumstances to pass.

An analysis of the parameters of plaintiffs' claimed due process right begins with the Supreme Court's decision in *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In that case, petitioner Joshua DeShaney, age 4, was beaten into a coma by his father and suffered severe brain damage. Before the attack, respondent Winnebago County Department of Social Services ("DSS") had investigated claims that Joshua was being physically abused, and temporarily removed Joshua from his father's custody. However, DSS had returned Joshua to his father and had not removed him again from his father's custody despite a caseworker's continuing suspicion in the months leading up to the attack that Joshua was being physically abused. Although the facts were compelling, the Supreme Court affirmed the dismissal of the case against DSS, holding that "nothing in the language of the Due Process Clause ... requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195, 109 S.Ct. at 1003.

Despite the foregoing, however, *DeShaney* also included language indicating that its holding did not necessarily apply to all circumstances. The Court acknowledged that if the state takes a person into custody and holds that person involuntarily, the Constitution imposes a duty to assume responsibility for the person's care and well-being. *Id.* at

---

**12.** The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." The Supreme Court has held that the Due Process Clause governs not only the procedures by which the government may act to "deprive any person of life, liberty or property," but also "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v.*

*Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). This concept of "substantive" due process "serves to prevent governmental power from being 'used for purposes of oppression.'" *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. (59 U.S.) 272, 277, 15 L.Ed. 372 (1856)); *see also Planned Parenthood v. Casey,* 505 U.S. 833, 846–847, 112 S.Ct. 2791, 2804–2805, 120 L.Ed.2d 674 (1992).

199–200, 109 S.Ct. at 1005–1006 (citing *Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 2458–2459, 73 L.Ed.2d 28 (1982) ("When a person is institutionalized—and wholly dependent on the State[,] . . . a duty to provide certain services and care does exist.")); *see also Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (holding that government has obligation to provide for health needs of incarcerated prisoners). Second, the Supreme Court implied that a plaintiff's due process rights may indeed be implicated if the State is affirmatively involved in creating the danger to which a plaintiff is subjected:

> While the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.* . . . The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.

*Id.* at 201, 203, 109 S.Ct. at 1006, 1007 (emphasis added).

This latter qualification of the Supreme Court's decision in *DeShaney* is central to an understanding of plaintiffs' due process claim. If plaintiffs contended simply that the City had failed to respond to requests from the Hasidic community for additional police protection during the Crown Heights disturbances, such a claim would arguably be barred by *DeShaney*, decided two years before the disturbances took place. However, the thrust of plaintiffs' argument is quite different: plaintiffs allege that defendants, by the inappropriate implementation of a policy of restraint, actually exacerbated the danger to the Hasidic community and rendered the community more vulnerable to violence by private actors.

In *Dwares v. City of New York*, 985 F.2d 94 (2d Cir.1993), the Second Circuit read *DeShaney* as providing for a due process right in those circumstances where the state "in some way had *assisted in creating or increasing the danger to the victim* . . . ." *Id.* at 99 (emphasis added). In *Dwares*, plaintiff participated in a rally in Washington Square Park at which an American flag was burned. Plaintiff was assaulted by "skinheads" who hit him around the head with a bottle. In his § 1983 complaint, plaintiff alleged that police officers were present at the time of the assault but did not intervene and that City police officers had conspired with "skinheads" to permit the latter to "beat up flag burners with relative impunity, assuring the 'skinheads' that unless they got totally out of control they would not be impeded or arrested." *Id.* at 99. In determining that plaintiff had adequately pleaded the violation of a constitutional right, the Second Circuit observed:

> It requires no stretch to infer that such prior assurances would have increased the likelihood that the "skinheads" would assault demonstrators. Thus, in the present case, the complaint asserted that the defendant officers indeed had made the demonstrators more vulnerable to assaults. Further, it alleged that the officers had in effect aided and abetted the deprivation of Dwares's civil rights by allowing him to be subjected to the prolonged assault in their presence without interfering with the attack. Such a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause.

*Id.* at 99.

The Second Circuit's decision in *Dwares* is consistent with one of the fundamental substantive purposes of the Due Process Clause—protection of "liberty in a social organization . . . against the evils which menace the health, safety, morals, and welfare of the people." *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391, 57 S.Ct. 578, 581, 81 L.Ed. 703 (1937). Indeed, among those liberties protected by the Constitution is "a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security." *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). The Supreme Court has made clear that the controlling principle in analyzing cases raising a claim of substantive due process is liberty. *Planned Parenthood*, 505 U.S. at 846, 112 S.Ct. at 2804. The Court in *Planned Parenthood* quoted the following language by the second Justice Harlan:

[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures and so on. *It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary, impositions and purposeless restraints, ... and which also recognizes, what a reasonable and sensitive judgement must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.*

*Id.* at 848–849, 112 S.Ct. at 2805 (quoting *Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1776–1777, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds)) (emphasis added); *see also Albright v. Oliver,* 510 U.S. 266, 271–272, 114 S.Ct. 807, 811–812, 127 L.Ed.2d 114 (1994). Although the Supreme Court has acknowledged that the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful," *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948), it is beyond dispute that the Due Process Clause was "'intended to secure the individual from the arbitrary exercise of the powers of government.'" *Daniels,* 474 U.S. at 331, 106 S.Ct. at 665 (quoting *Hurtado v. California,* 110 U.S. 516, 527, 4 S.Ct. 111, 116–117, 28 L.Ed. 232 (1884)) (other internal quotations omitted). For that reason, state involvement in the private wrong implicates the Fourteenth Amendment. *See Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

■ The Court concludes, therefore, that plaintiffs have properly set forth a substantive due process basis for relief under § 1983. The jury will determine at trial whether Dinkins or Brown, or any other state actor, had assisted in creating or increasing danger to the plaintiffs and, if so, whether such actions were the proximate cause of any injuries which plaintiffs sustained.

### 2. Was this Right Clearly Established?

The existence of the underlying § 1983 due process right does not, however, mean that Dinkins or Brown can be held individually liable for contributing to the violation of that right if the right was not clearly established in 1991. This "clearly established" linchpin for determining the applicability of the qualified immunity defense transcends the viability of the § 1983 claim. *See Gomez,* 446 U.S. at 640, 100 S.Ct. at 1923–1924. Thus, for qualified immunity purposes, the issue is not only whether Dinkins or Brown actually caused or contributed to the violation of plaintiffs' due process right, which might cast liability upon the City in the underlying § 1983 action, but also whether they should reasonably have been aware of this constitutional right. *See Ying Jing Gan,* 996 F.2d at 531.

The Court of Appeals for the Second Circuit has held that in determining whether a constitutional right is clearly established, the following factors are to be considered:

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*McEvoy,* 124 F.3d 92 (quoting *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991)). In *Anderson v. Creighton,* the Supreme Court held that in order to determine that a constitutional right is "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039.

As noted above, plaintiffs' due process claim rests upon the dicta in *DeShaney* regarding state creation of a dangerous condition and the Second Circuit's subsequent recognition of a "state-created danger" due process right in *Dwares.* However, plain-

tiffs' argument that Dinkins and Brown should be individually liable if they violated this right is complicated by the fact that *Dwares* was decided in 1993, two years *after* the unrest in Crown Heights. Indeed, Dinkins and Brown contend that they could not reasonably have been aware that such a due process right existed since the Second Circuit had not articulated the right until after the disturbances took place. Plaintiffs counter with the argument that the state-created danger theory had been articulated by circuit courts across the country prior to the Crown Heights debacle. The Court therefore turns to an examination of precedent setting forth the state-created danger theory in order to determine whether the contours of the theory were sufficiently clear to have made Dinkins and Brown reasonably aware that their conduct may have implicated plaintiffs' due process rights.

In *Bowers v. DeVito*, 686 F.2d 616 (7th Cir.1982), the question before the Court of Appeals for the Seventh Circuit was whether the Illinois State defendants' release of a psychiatric patient from a State hospital violated the rights of plaintiff's decedent, who was stabbed to death by the patient a year later. The court held that there was no due process violation arising from the State's failure to protect plaintiff's decedent from the attack. Most significantly for purposes of this motion, however, the court went on to state:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Id.* at 618–619; *see also Archie v. City of Racine*, 847 F.2d 1211, 1221 (7th Cir.1988) ("When the state puts a person in danger, the Due Process Clause requires the state to protect him to the extent of ameliorating the incremental risk. When a state cuts off sources of private aid, it must provide replacement protection."); *White v. Rochford*, 592 F.2d 381, 382 (7th Cir.1979) (holding that Due Process Clause was violated where "police officers ... abandon[ed] children and [left] them in [a] health-endangering situation[] after having arrested their custodian and thereby deprived them of adult protection"). *Bowers*, which hinted at the analysis that the Supreme Court later alluded to in *DeShaney*, nonetheless recognized that a due process violation could exist if the state actors actively put a person at risk of danger and then failed to afford adequate protection.

A similar analysis appears in opinions from other circuit courts both before and after *DeShaney*, and before the Second Circuit's decision in *Dwares* in 1993. Two cases are illustrative. In *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989), the plaintiff was a passenger in a car that was pulled over at 2:30 AM by a police officer. The officer determined that the driver of the vehicle was intoxicated and placed him under arrest, removed the keys from the car and had it impounded. The plaintiff claimed that the officer returned to his own car and drove away, leaving her in a high-crime area approximately five miles from her home. Plaintiff accepted a ride from a stranger and was subsequently raped. In reversing the district court's grant of qualified immunity to the officer, the court held that a question of fact existed regarding whether the officer deprived her of due process "by affirmatively placing her in danger and then abandoning her." *Id.* at 596.

In *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364 (3d Cir.1992), the Court of Appeals for the Third Circuit considered whether the defendants school and individual school employees should be held liable for acts of sexual molestation that occurred on school premises. Although the court did not find a due process violation under the facts of that case, it noted that "liability under the state-created danger theory is predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger," *id.* at 1374, and looked to whether the school defendants "create[d] plaintiffs' peril, increase[d] their risks of harm, or act[ed] to render them more vulnerable to the student defendants'

assaults." *Id.; see also L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992) (liability found in case in which inmate assaulted prison medical worker; state defendants "used their authority as state correctional officers to create an opportunity for [the inmate] to assault [plaintiff] that would not otherwise have existed. The Defendants also enhanced [plaintiff's] vulnerability to attack by misrepresenting to her the risks attending her work"); *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 358–359 (11th Cir.1989) (employee of town hall assaulted by inmate on work crew; prison officials' awareness of "the dangerous condition existing in the town caused by the inmates' presence there under inept supervision, ... the seriousness of [the inmate's] criminal history and violent background, ... and their actions in creating the dangerous work squad situation and in assigning the inmates to work in and around the town hall, resulted in the defendants' placing [plaintiff], unlike other members of the public, in a unique confrontational encounter with persons whom the plaintiff showed exhibited violent propensities" (internal quotations omitted)).

A slightly different case, dealing with state interference with protective services, is also relevant to the present inquiry. In *Freeman v. Ferguson,* 911 F.2d 52 (8th Cir.1990), cited in *Dwares,* plaintiffs alleged that the local police chief had such a close relationship to the attacker of plaintiffs' decedents that he failed to respond to the victims' repeated pleas for help. The Court of Appeals for the Eighth Circuit, reversing the district court's dismissal of the complaint, distinguished the facts of that case from those of *DeShaney,* noting that:

> The violence the decedents were subjected to was not solely the result of private action, but ... was also the result of an affirmative act by a state actor to interfere with the protective services which would have otherwise been available in the community—with such interference increasing the vulnerability of decedents to the actions of [their attacker] and possibly ratifying or condoning such violent actions on his part.

*Id.* at 54; *see also Ross v. United States,* 910 F.2d 1422, 1431 (7th Cir.1990) (deputy sheriff blocked efforts of private individuals, including police officer and lifeguards, to rescue drowning child and delayed rescue until official personnel arrived; court distinguished case from *DeShaney,* concluding that plaintiff had adequately alleged that the county had implemented a policy that cut off private sources of rescue without providing a meaningful alternative).

The foregoing discussion makes clear that other circuits had begun to map out the contours of the state-created danger due process right before the Second Circuit addressed the issue in *Dwares.* Having undertaken a review both of the applicable cases and the record in this case, however, the Court cannot conclude that the conduct here at issue fell within the contours of the right as it existed in 1991 such that Dinkins and Brown should reasonably have understood that their conduct violated plaintiffs' due process rights.

The state-created danger cases cited above principally involved identifiable state actors who subjected individual plaintiffs to a risk of harm. *Dwares,* like this case, is slightly different. Both rest upon allegations that a premeditated police decision to withhold protection emboldened violent private actors and made the plaintiff or plaintiffs more vulnerable to injury. They therefore combine elements of the state-created danger cases cited above and *DeShaney,* which addressed a failure to provide adequate police protection. The difference between failing to provide adequate protection, which is controlled by *DeShaney,* and creating a danger or rendering an individual more vulnerable to harm is far from clear-cut, and the cases cited above do not provide much assistance in navigating this legal territory.

In *Freeman,* which was decided in 1990, the Court of Appeals for the Eighth Circuit acknowledged that this area of the law was far from settled:

> It is not clear, under *DeShaney,* how large a role the state must play in the creation of danger and in the creation of vulnerability before it assumes a corresponding constitutional duty to protect.... *DeShaney*

does establish that the overall danger must at least be greater than it would be absent state action, and it also establishes that the increased danger created in a custodial setting is sufficient to trigger the duty. It says little about the grey area in between.

*Id.* at 55 (citations omitted). Similarly, in *Soto v. Flores,* 103 F.3d 1056 (1st Cir.1997), the Court of Appeals for the First Circuit held:

> The history of the state-created danger theory ... is an uneven one. The distinction between affirmatively rendering citizens more vulnerable to harm and simply failing to protect them has been blurred.... We conclude therefore that, in 1991, "the contours of the right were [not] sufficiently plain that a reasonably prudent state actor would have realized not merely that his conduct might be wrong, but that it violated a particular constitutional right."

*Id.* at 1065 (quoting *Martinez Rodriguez v. Colon Pizarro,* 54 F.3d 980, 988 (1st Cir. 1995)); *see also Cook v. City of Groton,* 952 F.Supp. 101, 102 (D.Conn.1997) ("A due process duty not to affirmatively misuse government power so as to create a danger to a person or render her more vulnerable to harm was not clearly established in the spring of 1991.").

■ Thus, the Court concludes that the state-created danger theory was not clearly established in 1991 and that Dinkins and Brown consequently could not have reasonably understood that their alleged conduct could have implicated plaintiffs' due process rights. Accordingly, plaintiffs' federal civil rights claims, to the extent that they are premised upon a violation of plaintiffs' due process rights, are subject to the affirmative defense of qualified immunity.

### 3. Was Dinkins and Brown's Conduct Objectively Reasonable?

Even if the Court had concluded that the due process right was clearly established in 1991, the Court would also determine that Dinkins and Brown's actions in connection with the Crown Heights disturbances were objectively reasonable.

The outstanding factual disputes between the parties do not preclude the Court from engaging in an analysis of the objective reasonableness of Dinkins and Brown's conduct. The parties do not dispute that Dinkins and Brown were aware that certain demonstrators were motivated by anti-Semitism. Although the parties sharply dispute the extent to which Dinkins and Brown were involved in the formulation of police strategy, for purposes of this discussion the Court will resolve this disputed issue of fact in plaintiffs' favor and will assume that Dinkins and Brown did in fact play a controlling role in planning the police response.

■ In determining whether the law enforcement strategy adopted during the first two and one-half days was an objectively reasonable response to the sudden outbreak of ethnic violence in Crown Heights, the Court must consider the information possessed by Dinkins and Brown when they are assumed to have adopted that strategy or during that time frame. *See Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3039–3040. The facts confronting Dinkins and Brown and the police at the beginning of the disturbances were grim. A man had been murdered in a burst of anti-Semitic rage. Violent demonstrators were lashing out against both the Hasidic community and the police. Both civilians and police officers were being injured, some seriously, and there was widespread destruction of property. In light of these circumstances, the Court concludes that the law enforcement strategy adopted by police, and Dinkins and Brown's assumed role in planning that strategy, were objectively reasonable, which is to say, that reasonably competent similarly situated public officials could disagree as to the legality of Dinkins and Brown's actions. *See Lennon,* 66 F.3d at 420.

Specifically, the Court cannot conclude that the decision not to make arrests for unlawful assembly during the first two and one-half days of the violence was objectively unreasonable. As noted above, in support of their argument that this decision was unreasonable, plaintiffs rely upon the deposition testimony of then-First Deputy Commissioner Kelly to the effect that making arrests for

unlawful assembly is a time-honored method of addressing civil unrest. However, in a letter that Kelly sent to Dinkins in November of 1992, he wrote: "there is no single strategy for policing disorder which will guarantee success in every instance. Techniques which are effective in one situation may prove disastrous in another."

To the extent that plaintiffs frame their argument that the City pursued a policy of "demonstration control" as opposed to "riot control" during the first days of the disturbances, Kelly's testimony is similarly of little assistance. He stated at his deposition that these terms are not used by the police and do not represent discrete conceptual approaches to addressing civil unrest. Rather, he testified:

> When police have demonstrations, certainly there is potential for violence where you maybe would respond as you would in a riot, so there is kind of a gray area, where they are commingled.... You have a demonstration, you have police deployed. If you have acts that are violent, you take action with the resources that you have there to police the demonstration.

Kelly Dep. at 74.

The fact that the strategy adopted on Thursday, August 22, effectively brought the unrest to an end does not conclusively prove that the approach taken on the first two and one-half days was objectively unreasonable; indeed, the Supreme Court has rejected such a "hindsight-based approach" as antithetical to the purposes underlying qualified immunity. *Mitchell,* 472 U.S. at 535, 105 S.Ct. at 2820. As the Court of Appeals for the Fifth Circuit observed ill *Salas v. Carpenter,* 980 F.2d 299 (5th Cir.1992):

> An important policy behind qualified immunity is to prevent litigation which "will unduly inhibit officials in the discharge of their duties." [*Anderson v.*] *Creighton,* 483 U.S. at 638, 107 S.Ct. at 3038.... Second-guessing the decision of law enforcement officers regarding the choice of police personnel in a crisis would undermine that policy. Lawsuits alleging that police should have acted one way or another in response to a [crisis] situation "pose[ ] a no-win situation for the police

and do[ ] nothing to encourage law enforcement or a respect for constitutional rights."

*Id.* at 311 (quoting *Taylor v. Watters,* 655 F.Supp. 801, 807 (E.D.Mich.1987)).

In short, it would be inappropriate for the Court to subject Dinkins and Brown to personal liability based upon a hindsight judgment that the outcome might have been better if a different strategy had been implemented from the outset. An individual who confronts an emergency necessarily acts "in agitation and with imperfect knowledge." *Wagner v. International Ry. Co.,* 232 N.Y. 176, 182, 133 N.E. 437 (1921) (Cardozo, J.). The reason for his or her actions "[is] not the reason of the morrow. It [is] reason fitted and proportioned to the time and the event." *Id.* It may appear to many that the strategy implemented by the police, at the assumed behest and approbation of Dinkins and Brown, was unwise. Even if the initial strategy be deemed ineffective or imprudent, Dinkins and Brown's presumed misjudgment does not translate to personal liability for violating the Constitution. As a civilized society, we rely upon government officials to act decisively in times of crisis, and we hope that the decisions they make effectively address the crisis. We should not, however, impose upon them the penalty of civil liability every time a critical decision, made under emergent, stressful conditions, does not have the desired effect or results in unanticipated consequences. Dinkins and Brown confronted chaotic conditions in Crown Heights and acted reasonably under the circumstances within the contours of the objective reasonableness standard that drives the qualified immunity inquiry. Both the clear weight of controlling precedent and the common sense policy rationale that underlies the qualified immunity doctrine compel the conclusion that they should be immune from personal liability.

The Court determines as a matter of law, therefore, that Dinkins and Brown are entitled to the defense of qualified immunity to plaintiffs' due process claim because: (1) plaintiffs' due process right was not clearly established in 1991; and (2) in any event, it

was objectively reasonable for Dinkins and Brown to conclude that they were not behaving in a manner that either created or increased the danger to plaintiffs.

## C. Equal Protection

### 1. The Claimed Constitutional Right

As with the Court's due process analysis, an examination of plaintiffs' equal protection claim begins with the Supreme Court's decision in *DeShaney*. In that case, the Court, even as it rejected the plaintiffs due process claim, nonetheless indicated that "[t]he State may not ... deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *Id.* at 197 n. 3, 109 S.Ct. at 1004 n. 3 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)); *see also Mody v. City of Hoboken*, 959 F.2d 461, 466 (3d Cir.1992); *Estate of Sinthasomphone v. City of Milwaukee*, 785 F.Supp. 1343, 1350 (E.D.Wis.1992) (action filed by family of Laotian-born victim of serial killer Jeffrey Dahmer). Counsel for Dinkins and Brown appropriately concedes that the equal protection right allegedly violated by defendants was clearly established at the time of the disturbances in 1991. Defendants' Memorandum of Law in Support of Motion for Summary Judgment at 23 n. 6.

██ It is well established that in order to prove an equal protection violation, a plaintiff must demonstrate that a discriminatory purpose was a "motivating factor" in the government decision. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). The Supreme Court has held that " 'discriminatory purpose' ... implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (citations omitted).

### 2. Qualified Immunity and Equal Protection

██ The Court's analysis of qualified immunity in the context of equal protection differs from its analysis for due process purposes since an equal protection claim requires a showing that the defendant's conduct was motivated by a discriminatory purpose. Acknowledging the paradox of using a purely objective test to analyze a constitutional right with a subjective element, the Court of Appeals for the Second Circuit nonetheless recently articulated a rule to apply whenever "the subjective state of mind of the [state] actor is part of the constitutional mix ... that balances the interests of the official claiming immunity against the interests of the [party] asserting unconstitutional motive." *Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir.1996); *see also Blue v. Koren*, 72 F.3d 1075, 1083 (2d Cir.1995). In such cases, the plaintiff must proffer "particularized evidence of direct or circumstantial facts ... supporting the claim of an improper motive...." *Blue*, 72 F.3d at 1084; *see also Sheppard*, 94 F.3d at 828. The proffered evidence may include statements by the officials involved as to their state of mind, circumstances suggesting "in a substantial fashion" that plaintiffs were treated differently, or evidence showing that the actions at issue were "highly unusual." *Blue*, 72 F.3d at 1084.

In *Blue*, the Second Circuit questioned whether this rule should be conceptualized as a "heightened standard," as other courts have opined, or as "simply an application of the rule that conclusory assertions are insufficient to defeat a motion for summary judgment." *Blue*, 72 F.3d at 1084 (citing *Fletcher v. Atex*, 68 F.3d 1451, 1455 (2d Cir.1995)). Regardless, the court held:

> If the conduct [at issue] was objectively reasonable, a conclusory proffer of an unconstitutional motive should not defeat the motion for summary judgment. The reasonableness of the conduct is itself substantial evidence in support of the motion and requires in response a particularized proffer of evidence of unconstitutional motive. Otherwise, the qualified immunity defense would be hollow indeed.

*Blue*, 72 F.3d at 1084; *see also Sheppard*, 94 F.3d at 828.

The Court's analysis of the objective reasonableness of Dinkins and Brown's conduct in the context of plaintiffs' due process claim leads to the same result in respect to their equal protection claim. Regardless of how the constitutional argument is cast, the Court determines that under the circumstances as Dinkins and Brown understood them at the time, the strategy implemented during the first two and one-half days of the disturbances was one upon which reasonably competent public officers of similar authority and experience could have differed in opinion.

Having determined that Dinkins and Brown's conduct was objectively reasonable, the Court accordingly turns to the inquiry mandated by *Blue* and *Sheppard*—whether the plaintiffs have proffered particularized evidence of direct or circumstantial facts in support of their claim that Dinkins and Brown acted with discriminatory intent. Plaintiffs have offered no proof that Dinkins or Brown uttered any anti-Semitic slurs or that there was an atmosphere of anti-Semitism within the Police Department or at City Hall that was knowingly tolerated by either Dinkins or Brown. *See Blue*, 72 F.3d at 1084; *Mody v. City of Hoboken*, 959 F.2d at 467. Although plaintiffs allege that Dinkins and Brown demonstrated a certain insensitivity to Jewish concerns, these varied claims fall well short of constituting particularized proof that either of them acted with discriminatory intent.

■ Plaintiffs argue that the violence had a severe impact upon the Hasidic community and reason that Dinkins and Brown's assumed strategic choices ignored this impact and in so doing elevated the interests of African–Americans over Hasidic Jews in a discriminatory way. But the law is clear that a showing of disproportionate impact does not suffice to establish discrimination under the Equal Protection Clause. " 'Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial determination.' " *Village of Arlington Heights*, 429 U.S. at 265, 97 S.Ct. at 563 (quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2048–2049, 48 L.Ed.2d 597 (1976)). Thus, where the only evidence proffered by plaintiffs relates to the impact of the strategy upon the Hasidic community, that evidence does not ripen into particularized proof that would support their claim of improper motive.

■ Plaintiffs further argue that Dinkins and Brown's awareness of the anti-Semitic component to the violence also serves as evidence of discriminatory intent. In *Feeney*, however, the Supreme Court stated that discriminatory purpose "implies more than *intent as volition or intent as awareness of consequences.*" *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296 (emphasis added). Therefore, in the absence of evidence that Dinkins or Brown adopted the policy because of its impact upon the Hasidic community, allegations that they were aware of that impact and that they failed to address the impact simply do not constitute particularized proof of discriminatory intent.

■ The only other evidence cited by plaintiffs are comments made by then-Governor Mario Cuomo to the press in which he stated that it was his understanding that a "day of grace" existed at the beginning of the disturbances, that is to say, that the police did not immediately clamp down on violence in Crown Heights. At his deposition, Cuomo flatly denied that either Dinkins or any of his deputies had ever made such a statement or indicated that a "day of grace" or period of restraint had existed. Deposition of Mario Cuomo at 29–30. However, even if the Court assumes that a policy of restraint, as manifested by the initial decision not to make arrests for "minor" crimes, did in fact exist during the first two and one-half days of the disturbances, the evidence proffered by plaintiffs in support of their claims that the policy was unusual or was discriminatorily motivated is conclusory at best. Even resolving all ambiguities and drawing all factual inferences in favor of plaintiffs, as the Court must, the Court concludes that plaintiffs have not made a particularized showing that Dinkins and Brown acted with improper discriminatory intent. Accordingly, the Court determines that Dinkins and Brown are also entitled to qualified immunity in respect to plaintiffs' equal protection claim. However, because plaintiffs have adequately pleaded the violation of their equal protection

rights, this claim will go forward against the City.

## D. State Causes of Action and Qualified Immunity

 Dinkins and Brown urge the Court to dismiss the eight remaining State causes of action against them in their individual capacities on the ground that the Court does not have supplemental jurisdiction over these claims. 28 U.S.C. § 1367. It is well established that the Court has broad discretion in deciding whether to continue to exercise supplemental jurisdiction over a State cause of action pursuant to 28 U.S.C. § 1367(c) after the dismissal of all federal claims against a particular party. *See Vona v. County of Niagara*, 119 F.3d 201, 209–210 (2d Cir. 1997); *Cushing v. Moore*, 970 F.2d 1103, 1110 (2d Cir.1992) ("The district court may exercise considerable discretion over what state claims it will include within its supplemental jurisdiction in a particular case."). In this case, the need for the Court to retain jurisdiction over the State causes of action is particularly acute. The entire action remains pending against the City; therefore, it makes little sense to splinter off identical State causes of action and require plaintiffs to litigate those claims against Dinkins and Brown in a separate State action. *See Leone v. Creighton*, 948 F.Supp. 192, 197 (E.D.N.Y.1996). Such a disposition would waste precious judicial resources and would impose a significant burden upon the plaintiffs, who have been conducting discovery in this case for more than four years.

However, Dinkins and Brown do not raise, nor have they ever raised, the issue of the applicability of immunity under State law to the State causes of action.[13] Upon the Court's independent review of New York State immunity law, it may well be that Dinkins and Brown are entitled to immunity in respect to the State causes of action as well as the federal claims.

 Under New York State law, "when official action involves the exercise of

discretion, [a municipal] officer is not liable for the injurious consequences of that action even if resulting from negligence or malice." *Tango v. Tulevech*, 61 N.Y.2d 34, 39, 459 N.E.2d 182, 185, 471 N.Y.S.2d 73, 76 (1983). However, immunity will not shield an officer, who, because of his or her misfeasance, has stepped outside the scope of his or her authority. *See Teddy's Drive In, Inc. v. Cohen*, 47 N.Y.2d 79, 82, 390 N.E.2d 290, 291, 416 N.Y.S.2d 782, 783 (1979); *see also Della Pietra v. State of New York*, 71 N.Y.2d 792, 796, 526 N.E.2d 1, 2–3, 530 N.Y.S.2d 510, 511–512 (1988). The New York Court of Appeals has held:

> Whether an action of a governmental employee or official is cloaked with any governmental immunity requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judgment. If these functions are essentially clerical or routine, no immunity will attach.... If a functional analysis of the actor's position shows that it is sufficiently discretionary in nature to warrant immunity, it must then be determined whether the conduct giving rise to the claim is related to an exercise of that discretion. Obviously, governmental immunity does not attach to every action of an official having discretionary duties but only to those involving an exercise of that discretion.

*Mon v. City of New York*, 78 N.Y.2d 309, 313, 579 N.E.2d 689, 692, 574 N.Y.S.2d 529, 532 (1991).

 While the federal law of qualified immunity is different from New York immunity law, the differences do not appear to preclude the prospect of granting summary judgment in favor of Dinkins and Brown in respect to all claims and causes of action on immunity grounds. A court may grant summary judgment *sua sponte* if the opposing party has notice that the entire case may be disposed of by summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106

---

**13.** Although defendants argued that the State causes of action should be dismissed in their 1993 motion, their Memorandum of Law in support of that motion only contended that they

should be dismissed on jurisdictional grounds, or, in the alternative, on the ground that New York State law does not impose a duty upon a municipality to provide police protection.

S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). However, the Second Circuit has emphasized that such power " 'must be exercised with great caution and with care taken to give the parties an opportunity to present materials in opposition.' " *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir.1996) (quoting *FLLI Moretti Cereali S.P.A. v. Continental Grain Co.,* 563 F.2d 563, 565 (2d Cir.1977)). Because the parties have neither raised nor briefed the State law immunity issue, it would be improper for the Court to grant summary judgment dismissing the State causes of action on that ground without affording plaintiffs an opportunity to be heard. *See Volvo North America Corp. v. Men's Intl. Professional Tennis Council,* 857 F.2d 55, 65 (2d Cir.1988). Therefore, the Court hereby gives notice that it is considering dismissing plaintiffs' State claims against Dinkins and Brown in their individual capacities based upon State law immunity principles.[14] The parties are given until Friday, September 12, 1997 to submit papers addressing this issue.

### III. CONCLUSION

For the foregoing reasons, the motion by Dinkins and Brown for dismissal of all federal claims against them on qualified immunity grounds is granted.[15] The Court will determine whether the State causes of action should proceed against Dinkins and Brown once it has received the parties' submissions on the issue of New York State immunity, or, should the parties elect not to submit such papers, following the September 12, 1997 deadline for submissions.

**SO ORDERED.**

---

**14.** By contrast, despite the fact that the parties did not specifically address the application of federal qualified immunity law to the §§ 1985 and 1986 claims, the Court does not require submissions on this issue since the Second Circuit has made it clear that the principles of qualified immunity applicable to § 1983 claims apply equally to claims arising under § 1985, which also implicate the § 1986 claim. *See* note 11.

**15.** In addition to the § 1983 claim, the §§ 1985 and 1986 claims must also be dismissed. *See* notes 11, 14.